**SPECIALTY ASSEMBLING & PACK-
ING CO., Inc.**

v.

**The UNITED STATES.**

No. 204–57.

United States Court of Claims.
Jan. 21, 1966.

Harold I. Cammer, New York City, attorney of record, for plaintiff.

John G. Roberts, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. Edwin J. Reis, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:*

The amended and supplemental petition filed by the plaintiff on March 14,

* This opinion incorporates—with a few minor alterations in wording and a substituted discussion of the claims relating to "Electron Tubes" (but no difference in result)—the opinion prepared, at the direction of the court, by Trial Commissioner Mastin G. White.

1960, contained 18 separate counts and asserted claims under a number of contracts that were entered into between the plaintiff and the defendant (acting through the Signal Corps of the Army) during the period 1949–1950.

On February 7, 1962, the court partially allowed a motion for summary judgment filed by the defendant, and dismissed counts 2, 4, 6, 8, 10, 12, 14, 15, 16, 17, and 18 (298 F.2d 794, 156 Ct. Cl. 252).

Thereafter, during the pretrial proceedings, the plaintiff voluntarily withdrew subparagraphs (b) and (c) of paragraph 4 of count 1, subparagraph (c) of paragraph 11 of count 3, subparagraphs (e), (g), and (h) of paragraph 17 of count 5, and counts 9, 11, and 13. Thus, there remain for consideration and disposition counts 1 (as modified), 3 (as modified), 5 (as modified), and 7. These counts involve four different contracts.

## FIRST COUNT

The first count of the amended and supplemental petition, as modified by the withdrawal of subparagraphs (b) and (c) of paragraph 4, relates to contract No. W–36–039–SC–46999 (which will usually be referred to hereafter in the commissioner's report as "contract 46999"). This contract was awarded to the plaintiff by the Signal Corps on May 25, 1949, and it originally called upon the plaintiff to produce 2,004 multimeters for an agreed price of $186,995. By a later amendment, the number of multimeters was increased to 2,520 and, with spare parts, the price was increased to $328,211.69. The contract scheduled the plaintiff's production deliveries to commence on November 30, 1949, and to end on February 23, 1950.

Contract 46999 provided that the multimeters were to be manufactured in accordance with U.S. Army Specification

71–3346. This was a performance-type specification that called for the production of an instrument which would meet specified performance standards in electrical measurement.

Paragraph 36 of contract 46999 required the plaintiff to submit five preproduction samples of the multimeter to the Signal Corps for approval within 120 days after the award, or by September 23, 1949. In this connection, subparagraph (c) of paragraph 36 provided that:

> The Government will retain the samples for a period not exceeding 55 days. The contractor will not go into production \* \* \* until written approval of the samples has been secured from the Contracting Officer.

A multimeter is an instrument that makes certain electrical measurements, particularly of voltages and resistances, essential for the testing and repair of electronic equipment. Contract 46999 called for the production of an instrument capable of measuring alternating current having a frequency range of up to 500 megacycles per second. No single instrument having such characteristics had previously been produced, and the plaintiff was not furnished any drawings or any model conforming to the specifications.

The heart of a multimeter is a radio frequency (RF) probe, the primary element of which is an electron tube known as a diode. No diode with the characteristics required by contract 46999 had been built prior to the letting of this contract, and considerable research and development work was required to produce an appropriate diode. While the probe was external to the rest of the instrument, being connected to it by a cable, the design of the entire instrument was dependent upon the design of the probe.

The plaintiff retained Kip Electronics, a manufacturer of electron tubes, and, with it, undertook to develop a diode that would meet the prescribed specifications. The resulting diode was incorporated into two engineering prototypes of the multimeter, which the plaintiff delivered to the Signal Corps Engineering Laboratories at Fort Monmouth, New Jersey, on October 28, 1949, for testing. These prototypes were not intended to be the preproduction samples called for by paragraph 36 of contract 46999.

The Signal Corps Engineering Laboratories lacked the equipment required for the testing of the engineering prototypes submitted by the plaintiff, and sent them to the Bureau of Standards in Washington, D. C., for evaluation and testing, particularly with reference to the operation of the probe. Examination and testing by the Bureau of Standards and conferences among the engineers representing the Bureau of Standards, the Signal Corps, and the plaintiff resulted in minor changes in the design of the diode, and in the determination that aging of the diode was essential in order to correct it for air entrapped on the interior surface of the glass, which resulted in unstable performance. Thereafter, the plaintiff proceeded to prepare five preproduction samples of the multimeter, incorporating in them the changes mentioned in the preceding sentence.

Between February 15 and 20, 1950, the plaintiff delivered to the Signal Corps the five preproduction samples called for by paragraph 36 of contract 46999. This was 5 months later than paragraph 36 required, but the defendant at no time complained of this delay.

As previously indicated, subparagraph (c) of paragraph 36 of contract 46999 provided that the defendant would retain the preproduction samples "for a period not exceeding 55 days," and that the plaintiff would not begin production of the multimeters "until written approval of the samples has been secured from the Contracting Officer." This provision clearly required the defendant to approve or reject the preproduction samples within 55 days after their submission, or by April 16, 1950. On three occasions between February and April 1950, the plaintiff advised the contracting officer that it was prepared to start

deliveries within 45 days after the receipt of the required written approval. The defendant never gave written approval of these samples.

As it had done with the engineering prototypes, the Signal Corps sent the preproduction samples to the Bureau of Standards for testing, and over a year's delay ensued. The delay was due to the fact that the Signal Corps Engineering Laboratories did not possess the required RF standards for the specified frequency and voltage ranges, and much time was lost in scheduling these tests to take place at the Bureau of Standards in Washington, D. C. Furthermore, the Bureau of Standards required a great deal of time for the preparations that were necessary in order to make these tests.

By October 1950, the Bureau of Standards had not yet completed its tests. The parties thereupon agreed to establish at the plaintiff's plant a pilot run under the supervision of a Signal Corps field engineer in an effort to develop pragmatic test procedures by means of which it could be determined whether the multimeters produced by the plaintiff performed in accordance with the specifications. A pilot run is an experimental method sometimes employed for initial, limited production of a new item on a tentative basis and under close engineering supervision.

In April 1951, as a result of the experience gained from the pilot run at the plaintiff's plant, test procedures were agreed upon by the Signal Corps field engineer, engineers of the Bureau of Standards, and representatives of the plaintiff.

In June 1951, the plaintiff received the return of one of its preproduction sample multimeters, which the Bureau of Standards had calibrated for use as a standard by which to test other instruments produced under contract 46999.

Prior to July 6, 1951, the defendant did not accept any of the multimeters produced during the pilot run, except for five units which the defendant took in February 1951 under a waiver by the contracting officer to meet an emergency requirement. Commencing July 6, 1951, the defendant began accepting deliveries under contract 46999; and by September 18, 1951, approximately 400 units had been delivered to the defendant. By a letter dated September 18, 1951, the defendant terminated the pilot run. Thereupon, the plaintiff commenced normal production of the multimeters. Deliveries under the contract were completed in May 1952.

The multimeters which the plaintiff eventually produced and which the defendant accepted under contract 46999 were identical with the preproduction samples which the plaintiff submitted in February 1950, except for some minor corrections requested by the defendant.

As a party to a contract, the Government has rights and obligations similar to those of a private person under similar circumstances. Perry v. United States, 294 U.S. 330, 352, 55 S. Ct. 432, 79 L.Ed. 912 (1935); Standard Rice Company, Inc. v. United States, 53 F.Supp. 717, 101 Ct.Cl. 85, 95 (1944), affirmed 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104. Therefore, when the Government promised in subparagraph (c) of paragraph 36 of contract 46999 to approve or reject the plaintiff's preproduction samples within 55 days after their submission, there was implicit in this promise an assurance to the plaintiff that the Government was able to, and would, discharge its obligation in this respect. Carnegie Steel Co. v. United States, 240 U.S. 156, 165–166, 36 S.Ct. 342, 60 L.Ed. 576 (1916). It is true that the Government encountered unforeseen difficulties in acting on the preproduction samples, due principally to the fact that the probe to be produced under the contract as an integral part of the multimeter was a new device and the Government could not be sure that the existing test procedures were fully capable of measuring the performance characteristics of the probe. However, these unforeseen difficulties did not excuse the Government from discharging the plain obligation which it had imposed upon

itself, as the drafter of contract 46999, to approve or reject the preproduction samples within 55 days after their submission. United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Columbus Ry., Power & Light Co. v. City of Columbus, 249 U.S. 399, 412, 39 S.Ct. 349, 63 L.Ed. 669 (1919).

■ Perhaps it should be mentioned, in this connection, that the plaintiff also failed to discharge the obligation which it assumed in paragraph 36 of contract 46999 to deliver the five preproduction samples to the Signal Corps within 120 days after the award of the contract. Since the Government accepted the plaintiff's tardy performance without raising any objection, this default on the part of the plaintiff cannot provide an offset for the Government's subsequent default in the matter of approving or rejecting the preproduction samples within 55 days after their delivery. Drinc-O-Matic, Inc. v. Frank, 141 F.2d 177, 179–180 (2d Cir., 1944).

It is clear that the failure of the defendant to act upon the plaintiff's preproduction samples within 55 days after the plaintiff submitted them to the Signal Corps constituted a breach of the defendant's obligation under subparagraph (c) of paragraph 36 of contract 46999.

### THIRD COUNT

The third count of the amended and supplemental petition, as modified by the withdrawal of subparagraph (c) of paragraph 11, relates to contract No. DA–36–039–SC–4661 (which will usually be referred to hereafter in the report as "contract 4661"). This contract was awarded to the plaintiff by the Signal Corps on June 23, 1950, which was 2 days before the United States began its participation in the Korean hostilities. Contract 4661 required the plaintiff to produce 21 power rectifiers for an agreed price of $58,050 (later increased to $59,073.24). It provided that deliveries should commence 420 days after the award, or by August 16, 1951, and should be completed 2 months later.

A power rectifier is a piece of electronic equipment used to change the voltage and other characteristics of an electric current and to filter the "noise" from it in order to make it suitable for the operation of other electronic equipment. Contract 4661 called for the production of a unit which would meet certain performance specifications. No blueprints, designs, or circuit diagrams were furnished in connection with contract 4661, but under the terms of the contract, the plaintiff was to be supplied by the Signal Corps with a model of a power rectifier, and the plaintiff was to copy the model after verifying that it met the pertinent specifications.

Subparagraph (a) of paragraph 11 of contract 4661 required the defendant to furnish the plaintiff with the model mentioned above within 50 days after the award, or by August 12, 1950. Subparagraph (b) of paragraph 11 provided as follows with respect to the model:

> Subject to the right of the contractor to inspect and reject the property for good and sufficient reasons within a period of 30 days after delivery the contractor shall receive the same in its then condition, without warranty, express or implied on the part of the Government as to serviceability or fitness for use. Any such property rejected by the contractor shall be replaced by the Government at Government expense, after a confirming inspection has been made by a Government inspector.

August 12, 1950, passed without the delivery of the model. Thereafter, the plaintiff made repeated efforts to obtain the model from the Signal Corps by means of a letter, two telegrams, and several personal visits. Being unable to let supply contracts before receiving the model, and being alarmed by the material shortages and price increases resulting from the Korean conflict, the plaintiff advised the contracting officer on October 17, 1950, and again on October 25, 1950, before receiving the model, that the

plaintiff would be required to seek a price adjustment because of the delay.

The defendant did not ship the model of the power rectifier until October 23, 1950, and the plaintiff did not receive it until October 25, 1950, or 74 days after the defendant was obligated to furnish the model to the plaintiff.

The delay by the defendant in supplying the model to the plaintiff was due to the circumstances that contract 4661 grew out of an invitation for bids that covered other major items in addition to the 21 power rectifiers involved in contract 4661. It was anticipated by the defendant, at the time of the issuance of the invitation for bids, that it would result in a single contract and that the model of the power rectifier referred to in paragraph 11 of the prospective contract would be furnished to the successful bidder. However, it was ultimately decided by the defendant to let three separate contracts on the basis of the invitation for bids, with the result that the defendant was obligated to furnish models of the power rectifier to three different contractors, instead of merely furnishing one model to one contractor. The problem of procuring the extra models accounted for the defendant's delay of 74 days in furnishing a model to the plaintiff.

■ However, the unexpected difficulty which the defendant encountered in complying with the contractual requirement which the defendant had imposed upon itself by subparagraph (a) of paragraph 11 of contract 4661 to furnish a model of the power rectifier to the plaintiff within 50 days after the award, or by August 12, 1950, did not excuse the defendant from discharging its obligation. United States v. Spearin, supra, 248 U.S. at p. 136, 39 S.Ct. 59; Columbus Ry., Power & Light Co. v. City of Columbus, supra, 249 U.S. at p. 412, 39 S.Ct. 349. Therefore, the defendant's delay of 74 days in furnishing the model constituted a breach of contract.

■ It appears that the model, at the time when it was received by the plaintiff, was not in an operable condition. The plaintiff is not entitled to complain of this, however, because the plaintiff did not reject the inoperable model within the 30-day period prescribed by subparagraph (b) of paragraph 11 of contract 4661.

Instead of proceeding under the contract, the plaintiff informed the contracting officer by letters dated November 13 and 30, 1950, that it was withholding production under contract 4661 pending advice as to whether, in view of the cost increases resulting from the delayed delivery of the model, the defendant would agree either to a price adjustment or to a provision for price redetermination upon completion of the contract. The contracting officer did not reply to these letters.

Not yet having received a reply to its letters of November 13 and 30, 1950, the plaintiff wrote the contracting officer again on December 22, 1950, reiterated its request for price relief, and offered, in the alternative, to cancel the contract without cost to the Government. This letter informed the contracting officer for the first time that the model of the power rectifier which the Signal Corps had furnished the plaintiff was not in an operable condition.

By a letter dated January 3, 1951, the contracting officer rejected the plaintiff's offer to cancel the contract, and demanded that the plaintiff proceed under the contract.

The plaintiff repaired the model of the power rectifier by January 5, 1951, without any particular difficulty, and the model was then found to meet the specifications. The plaintiff thereupon proceeded with performance under contract 4661. The plaintiff commenced deliveries in November 1952, or more than a year after the time prescribed in the contract, and completed them the following month. As previously indicated, the defendant was responsible for only 74 days of this delay.

## FIFTH COUNT
### General

The fifth count of the amended and supplemental petition, as modified by the withdrawal of subparagraphs (e), (g), and (h) of paragraph 17, relates to contract No. W–36–039–SC–45928 (which will usually be referred to hereafter in the report as "contract 45928"). Under this contract, the plaintiff was to produce 38 radio direction finders and associated items for an agreed price of $454,529.64. The contract called for the delivery of five radio direction finders per month commencing January 1, 1950, with a final delivery of three units on August 1, 1950.

The requirements of contract 45928 were in the nature of performance specifications, i. e., the contract described performance characteristics of the equipment but did not give design details of the equipment. The Signal Corps did furnish the plaintiff a model for use as a general guide, though the model was not the standard and the specifications controlled. Drawings were not furnished to the plaintiff by the Signal Corps.

A radio direction finder is an electronic system for determining the direction from which a radio signal is being transmitted and, by means of bearings obtained from the simultaneous operation of two systems, for locating the source of the signal. It is an exceedingly complex instrument, involving many different parts. Its effectiveness depends upon a high degree of precision, both electrical and mechanical, in its construction.

Each system called for by contract 45928 included a group of major equipments with accessories, weighed approximately 4,000 pounds, and was designed to be transportable by air in 11 carrying cases. It was to have unique characteristics, in that it was to cover frequencies of up to 30 megacycles, it was to give instantaneous readings, and it was to have other uncommon features. Although methods of transmitter location were well known, the system to be produced under this contract was relatively new, and this was the second contract for its commercial production that had been awarded.

This system had been developed by Paul Hansel while in the employ of the Signal Corps during the latter part of World War II and thereafter. The only previous contract for its manufacture had been awarded to the Radio Corporation of America and had been monitored by Mr. Hansel for the Signal Corps during his employment by that agency. At the time of the award of contract 45928 to the plaintiff, Mr. Hansel was employed by Servo Corporation of America in the capacity of chief engineer.

Upon being awarded contract 45928, the plaintiff subcontracted the major portion of the electronic work under the contract to Servo Corporation and, with the latter's approval, retained Paul Hansel as the plaintiff's consulting engineer for the performance of the contract.

### Electron Tubes

Subparagraph (a) of paragraph 17 of the fifth count asserts a claim relative to electron tubes. In this connection, contract 45928 provided that, within 30 days after the award of the contract, the Signal Corps would furnish the plaintiff with the electron tubes, conforming to the JAN (Joint Army-Navy) specifications, which were required for incorporation into the radio direction finders. These tubes were to be integral parts of the systems, regulating and modifying current, and preserving a high degree of uniformity of amplitudes and phase balance.

The radio direction finders manufactured under contract 45928 contained a goniometric circuit, which depended upon achieving a null reading when the set was in balance, at which time an accurate bearing of the radio signal was indicated. This null reading required balanced electron tubes which would monitor the electric current with a high degree of precision.

Because of the high degree of precision required, it was quite possible to have two electron tubes which—although each was built to perform within the specifications for such tubes—would not be

close enough in performance to afford the balance needed to achieve the critically important null reading. A very small difference between these tubes would represent a very large percentage of error as compared with the ideal zero.

The problem of balancing tubes in the circuits of the radio direction finders under contract 45928 was handled by Servo Corporation under its subcontract with the plaintiff.

A substantial percentage of the tubes furnished by the Signal Corps were defective. In accordance with the terms of the contract, replacements for such tubes were supplied by the Signal Corps upon notification, and no complaint is made by the plaintiff regarding undue delay in this connection.

Specialty complains, however, that the Government supplied many electron tubes which were below JAN standards; that these tubes were unsuitable for incorporation into the radio direction finders because they were old and lacked the uniformity requisite to permit the necessary balancing to be achieved; and therefore that the Government breached its contractual obligation to supply components reasonably fit for their intended use. Plaintiff says that it has reimbursed Servo Corporation (its subcontractor) for expenses Servo incurred in performing the contract with the defective Government-furnished tubes. It seeks to recover the amount of this reimbursement, as well as for damages resulting from disruption of its operation.

In attempting to prove this claim, plaintiff attaches great weight to certain correspondence between it and the Signal Corps contracting officer early in 1951. On January 23, 1951, it wrote to the contracting officer stating, in pertinent part, that certain tubes which the Government had furnished, as required by the contract, "were manufactured at different times and places and * * * are quite old, many of them being five years old and more." While plaintiff thought that the tubes "might be used" satisfactorily, it also felt that they "do not have inherent life and there are, in many instances, defects which cannot readily be detected, which may impair the usefulness of the systems over a period of service in the field." It "accordingly" suggested that the contract be amended and that it be "authorized to purchase new ruggedized tubes, where ruggedized tubes are made, for use on this contract." Responding to this request, the contracting officer noted, in part, on April 3rd that "since it has been determined that the various GFP tubes are quite old and have been found unsuitable for use in the subject equipments due to the instability of the tubes, it is proposed to modify the order to permit your company to furnish new tubes of your own procurement in lieu of the GFP tubes as rapidly as practicable." This, plaintiff avers, amounts to an admission by the Government that it furnished tubes substantially inferior to those it agreed to supply, i. e., tubes below the pertinent JAN standards. On the basis of this correspondence, and supporting testimony of the plaintiff's general manager, we are asked to find a breach of contract.

Having considered the entire record, we think that plaintiff's primary cause for complaint at the time of its January 23rd letter was that it was being required to use JAN tubes built according to imprecise, outdated specifications. The equipment to be constructed was sensitive, and plaintiff desired to use tubes manufactured to the closest possible tolerances. The state of the art of tube design had advanced; parties doing business commercially would not take JAN specification tubes. Plaintiff wanted to buy "new ruggedized tubes" (which were superior, built to specifications higher than the JAN's and gave less trouble), and its main purpose in writing was to receive permission to do this. In short, plaintiff's dissatisfaction was with JAN specification tubes as such, not with the Government-furnished JAN tubes because they were old and defective (according to the JAN standard). The principal source of this dissatisfaction is pinpointed by the fact that plaintiff's essential difficulties and expenses

in balancing tubes persisted during the period when it purchased JAN specification tubes on its own from commercial suppliers (see finding 54). Presumably, at that time, plaintiff received tubes conforming to the JAN specifications, not below them.[1] If plaintiff's earlier difficulties had been caused by the Government's furnishing of substandard JAN tubes, they would have abated with its use of standard JAN tubes. But they did not. Old or new, JAN specification tubes were inferior, and the task of balancing them was time-consuming and expensive.

Correspondence between Servo and Specialty also supports the conclusion that Servo's damages, for which plaintiff now seeks to recover, did not flow from a default by the Government but from the inherent nature of tubes meeting JAN specifications. On December 5, 1951, Servo's president wrote to Specialty's president stating that the problems it faced in balancing tubes arose "from inadequate initial engineering design", that "present tube production methods are not good enough" to enable the job to be done without substantial expense, and that Servo could not "accept any responsibility for design inadequacy, when even the best tubes available in the United States have sufficient drift to require frequent rebalancing." This letter makes it plain that any additional expenses Servo may have incurred in fabricating the radio direction finders did not arise because the Government supplied tubes which were below JAN standards. Causes other than the defendant's alleged default were responsible. Probably the main cause was the state of the art of tube design and tube production as reflected in the JAN specifications which plaintiff had agreed to use—but this does not provide any basis for the assertion of a valid claim against the defendant.

■ We think that, when all factors are balanced, the evidence supporting the Government's position outweighs that to which the plaintiff points. The contracting officer's reply of April 3rd, supra, to Specialty's inquiry of January 23, 1951, is equivocal. It does not state that the tubes are unsuitable because they are old or substandard. It merely says that the Government-furnished property has "been found unsuitable for use in the subject equipments *due to the instability* of the tubes * * *." (Emphasis supplied.) The nature or cause of this "instability" is not stated. During the period in question, electron tubes were, in one important sense, inherently unstable inasmuch as it was commonplace for various tubes meeting the pertinent specifications to fail, when used together, to produce accurate, null readings in radio direction finders. JAN tubes may have been especially liable to this failing. Since plaintiff agreed to perform the contract with JAN tubes, its burden is to demonstrate that the tubes it received from the defendant were more unstable than was normal for that specification of tube. The cryptic statement in the contracting officer's letter (upon which plaintiff relies) admits this only if read broadly and favorably to the plaintiff; without more than this record reveals, we are unable so to read it.

■ Neither can we attach controlling significance to the testimony—more than a decade after the fact—of plaintiff's general manager that the tube-balancing difficulties encountered by Servo arose from the Government's furnishing of substandard JAN tubes. He stated, for example, that JAN specifications normally did not permit the use of old tubes, but Signal Corps engineers said that age alone normally had nothing to do with the suitability of tubes, and that the specifications required the Government to inspect tubes more than a year old before they were used. Moreover, with respect to the problem of balancing electron tubes, plaintiff's general manager testified as follows: "Well, I never got

---

1. Plaintiff's general manager testified that it was given commercial rejects at that time by commercial suppliers, but he admitted that they satisfied JAN specifications. Plaintiff's brief and exceptions also indicate that the tubes it received from commercial producers conformed to JAN specifications.

involved too much in that problem because the whole problem in its totality was turned over to Servo" almost immediately after the award of the contract. As we have noted, documentary evidence shows that Servo attributed its difficulties to the general low level of the state of the art of tube design at the time the contract was being performed. Finally, while it is possible that the time-consuming and expensive task of balancing tubes was made slightly more so by the failure of certain of the Government-furnished tubes to balance on account of their age, rather than their inherent instability, plaintiff has proved no damages (apart from general delays for which it is awarded an adequate recovery on other aspects of this count or which could have resulted from a number of other causes) attributable to such failures (if any occurred).[2] As a result, we are unable to grant any recovery on this aspect of the plaintiff's petition. See River Constr. Corp. v. United States, 159 Ct.Cl. 254, 259, 270–271 (1962).

### Approval of Components

Subparagraph (b) of paragraph 17 of the fifth count relates to the approval of nonstandard components.

Contract 45928 did not require the plaintiff (and its subcontractors) to secure the prior approval of the Signal Corps for the use in the radio direction finders of standard components which had previously been approved by the defendant as meeting the JAN specifications. However, the prior approval of the Signal Corps was required by the contract for the use of nonstandard components. The contract did not specify the period of time within which the Signal Corps was required to act on requests for the approval of nonstandard components.

On April 19, 1950, Servo Corporation (acting on behalf of the plaintiff) requested the approval of the Signal Corps for the use of the following nonstandard components in the radio direction finders: power transformers, tube sockets, power resistors, switches, tube clamps, braided spaghetti, and selenium rectifiers. These components were essential to the equipment which Servo Corporation was producing under its subcontract with the plaintiff, as such equipment could not be finally assembled and tested without the named components. Firm orders for the components covered by Servo's request could not be placed until approval for their use could be obtained from the Signal Corps.

Approval for the use of the components mentioned in Servo Corporation's request of April 19, 1950, was given by the Signal Corps at different times during the period beginning May 3, 1950, and ending April 10, 1951, as indicated below:

Power transformers ...........................December 12, 1950
 April 10, 1951
Tube sockets .................................June 2, 1950
Power resistors ..............................May 3, 1950
Switches .....................................June 2, 1950
Tube clamps ..................................May 3, 1950
Braided spaghetti ............................May 3, 1950
Selenium rectifiers ..........................June 16, 1950

---

**2.** Plaintiff's brief claims that it incurred damages of $25,000 in reimbursing Servo for work done with allegedly defective Government-furnished tubes. But the evidence contradicts this assertion. Plaintiff's general manager testified that this $25,000 covered the period after plaintiff had received Servo's letter of December 5, 1951, putting Specialty on notice of difficulties in using Government tubes. During that period, however, plaintiff was not using Government-furnished tubes, since it had received final approval to go out and buy tubes

In granting approval for the use of the components covered by Servo Corporation's request, the Signal Corps required minor changes in some instances.

■ Contract 45928 did not specify the period of time within which the Signal Corps was required to act on requests for the approval of nonstandard components. In such a situation, the law imposes an obligation to act within a reasonable period of time. Peter Kiewit Sons' Co., Inc. v. United States, 151 F. Supp. 726, 138 Ct.Cl. 668, 674–675 (1957).

■ On the basis of the dates alone, the court is not justified in finding that the Signal Corps delayed unreasonably in waiting from April 19 until May 3, 1950, before acting on Servo Corporation's request with respect to power resistors, tube clamps, and braided spaghetti; or that the Signal Corps delayed unduly in waiting from April 19 until June 2, 1950, before acting on the request with respect to tube sockets and switches; or that the Signal Corps delayed unduly in waiting from April 19 until June 16, 1950, before acting on the request relative to selenium rectifiers. On the other hand, the lapse of time between the making of the request on April 19, 1950, and action by the Signal Corps on December 12, 1950, and April 10, 1951, in connection with the power transformers does seem to have been unreasonably long. In so far as the power transformers are concerned, therefore, it appears that the Signal Corps breached its implied contractual obligation to act on Servo Corporation's request of April 19, 1950, within a reasonable period of time.

## Test Sets

Subparagraph (c) of paragraph 17 of the fifth count asserts a claim relative to test sets.

Contract 45928 provided that, within 30 days after the award, the defendant would furnish the plaintiff with 38 pieces of equipment denominated as I–56–K test sets. The plaintiff was required to incorporate an I–56–K test set into one of the housings of each complete system to be produced under contract 45928. The function of the test set was to verify the operation of the radio direction finder in the field.

The defendant did not supply any I–56–K test sets until September 1949. At that time, it furnished only 11 test sets, all in poor condition. The defendant furnished 27 additional test sets in March 1950, but these were not of the same size as the first 11 sets. The plaintiff was unable to design the chests into which these test sets were to fit because of the differences in the dimensions of the furnished sets and the requirement of contract 45928 that all equipment should be interchangable among the 38 systems. The defendant did not furnish the plaintiff with 38 I–56–K test sets of uniform size until August 1950. The plaintiff was thus delayed for approximately 14 months in designing the housing for the test sets.

The plaintiff, in letters dated March 2, April 27, July 3, and July 17, 1950, complained to the contracting officer regarding the failure of the defendant to provide I–56–K test sets of uniform size.

■ It is obvious that the defendant did not comply with its contractual obligation to provide the plaintiff with the I–56–K test sets within 30 days after the award of contract 45928 on May 26, 1949.

The defendant contends, however, that the plaintiff is precluded from recovering on this claim for the reason (among others to be discussed in a subsequent portion of this opinion) that on August 17, 1950, after the defendant had furnished to the plaintiff 38 I–56–K test sets of

commercially on April 3, 1951. By April 1951, the plaintiff had shipped the first 24 sets called for by the contract. Shortly after April 3, 1951, plaintiff apparently began using purchased tubes in fabri-

cating the sets; Servo admitted on December 5, 1951, that its damages due to tube difficulties on the first 38 sets were only $4,000.

uniform size, the plaintiff wrote a letter to the contracting officer stating in part as follows:

> Since then [i. e., since July 17, 1950] the Government has sent us Test Sets I–56–K which are suitable without substantial modification and therefore we rescind our letter of July 17th and no additional charge to the Government is requested on this account.
>
> We refer also to our letter of July 3rd which discussed this same subject and this letter may now be ignored as no significant change in the chests, into which these test sets go, will be required, and there will be no increase in cost to the Government on this account.

The plaintiff's letter of August 17, 1950, did not purport to be, and it was not, a formal release of the plaintiff's claim with respect to the I–56–K test sets, nor was it a promise to release based upon new consideration. Rather, the communication of August 17, 1950, was in the nature of an informal statement by the plaintiff of its intention at that time not to assert a claim in connection with the matter of the test sets. The plaintiff later had a change of mind in this respect, and the letter of August 17, 1950, was not a bar to the subsequent assertion of a claim.

### Nomenclature

Subparagraph (d) of paragraph 17 of the fifth count complains of alleged delay by the Signal Corps in furnishing nomenclature and serial numbers. In this connection, contract 45928 required the plaintiff to identify the parts incorporated into the equipment by stamping, banding, or tagging the parts with appropriate nomenclature and stock and code numbers. The contract obligated the defendant to assign nomenclature and numbers to the parts that required them within 30 days after the plaintiff supplied descriptions to the defendant.

In many instances, the stamps, bands, or tags bearing the required nomenclature and numbers had to be affixed to the parts prior to their assembly into the equipment. Also, the nomenclature and numbers were required for inclusion in the technical manual which the plaintiff contracted to supply with the equipment.

On March 1, 1950, the plaintiff forwarded the required descriptions to the defendant, and requested the assignment of nomenclature and numbers.

In letters dated April 24, April 28, June 15, June 23, July 6, July 12, July 17, and November 14, 1950, the plaintiff wrote to the defendant regarding the urgent need for the assignment of nomenclature and numbers.

Some nomenclature and numbers were assigned by the defendant in a letter dated June 16, 1950. Other nomenclature and additional numbers were assigned by the defendant in oral communications over the telephone to the plaintiff in October and November 1950. The remaining nomenclature and numbers were assigned by the defendant in a letter to the plaintiff dated December 5, 1950.

The nomenclature and numbers were assigned by the defendant on the basis of the descriptions submitted by the plaintiff in March 1950.

The defendant's delay in supplying the required nomenclature and numbers delayed the plaintiff in assembling components and in preparing the technical manual.

The evidence plainly indicates a long delay by the defendant, beyond the 30-day period prescribed by the contract, in assigning nomenclature and numbers. Hence, the defendant breached its contractual obligation in this respect.

### Test Procedures

Subparagraph (f) of paragraph 17 of the fifth count relates to test procedures.

Contract 45928 required the plaintiff to utilize specified test procedures to demonstrate the accuracy of the radio direction finders for the intended purpose. The test procedures prescribed by the contract were the same test procedures which had been used by the Radio Corporation of America when that com-

pany was producing radio direction finders under the earlier contract. Such test procedures had proved to be difficult and cumbersome to use in connection with the testing of the equipment produced by RCA, but the Signal Corps, at the time of letting contract 45928 to the plaintiff, was unaware of any alternate test procedures that would have been better.

Upon being advised early in 1951 by Paul Hansel, its consulting engineer for the performance of contract 45928 and the man who had developed the equipment that was to be produced under this contract, that he regarded the prescribed test procedures as unsatisfactory, the plaintiff proposed to the Signal Corps in February 1951 that the plaintiff attempt to develop alternate test procedures. This proposal was approved by the Signal Corps. The plaintiff thereafter submitted proposed alternate procedures to the Signal Corps in August 1951, and the Signal Corps approved them, with minor modifications, in October 1951.

 The evidence in the record does not show a breach by the defendant of any contractual obligation that it owed the plaintiff in connection with the matter of test procedures. It is true that the Signal Corps was aware, at the time of the letting of contract 45928 to the plaintiff, that the prescribed test procedures had proved to be difficult and cumbersome to use in connection with the testing of the equipment produced by the Radio Corporation of America, and the defendant did not bring this to the attention of the plaintiff prior to or at the time when the parties entered into the contract. However, the Signal Corps was unaware of any alternate test procedures that would be more suitable. Under these circumstances it would impose an unreasonable burden on the Government as contractor to hold in the present case that the Signal Corps was under an implied contractual duty to put the plaintiff on notice with respect to *all* the difficulties known to the Signal Corps that might be encountered in the performance

of the contract. Cf. Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 777–778, 160 Ct.Cl. 437, 442–444 (1963).

## SEVENTH COUNT

The seventh count of the amended and supplemental petition involves contract No. DA–36–039–SC–873 (which will usually be referred to hereafter in the report as "contract 873"). Under this contract, which was awarded to the plaintiff by the Signal Corps on June 23, 1950, the plaintiff was to produce 40 radio direction finders and associated items for an agreed price of $405,930. By amendments to the contract, the number of units was increased to 59 and the price, with changes and extras, was increased to $627,803.02.

The equipment to be produced under contract 873 was identical with that called for by contract 45928, and the provisions of the two contracts were similar, except that under contract 873 the plaintiff was to furnish the electron tubes that were to be used in the radio direction finders.

Deliveries under contract 873 were to commence in January 1951 (4 months after deliveries were to have been completed under contract 45928), and were to be completed by August 1951.

The evidence does not show any failure by the defendant to fulfill its contractual obligations under contract 873.

 The plaintiff contends that the defendant's breaches of contract 45928 had an adverse effect upon the performance by the plaintiff of contract 873 and increased the cost that the plaintiff otherwise would have incurred in performing the later contract. Actually, the proof in the record does not establish the supposed relationship between the defendant's breaches of contract 45928 and the adverse effect upon the plaintiff's performance of contract 873. However, even if such relationship were established, the defendant's liability under contract 45928 would not extend to the incidental effect of the breaches of that contract upon the performance of another

contract, which the defendant did not breach, since those consequences would not have been reasonably foreseeable by the defendant at the time when the breaches of contract 45928 were committed. Myerle v. United States, 33 Ct.Cl. 1, 27 (1897).

■ Furthermore, in this connection, it should be noted that the plaintiff, when it entered into contract 873 on June 23, 1950, was already aware that the Signal Corps had not acted on the request for permission to use nonstandard power transformers under contract 45928, had not furnished 38 I–56–K test sets of uniform size under the earlier contract, and had not assigned the bulk of the nomenclature and numbers needed under the earlier contract. Hence, the plaintiff is not in a position to complain about the incidental effect (if any) that the defendant's defaults under contract 45928 had upon the plaintiff's performance of contract 873.

## ADMINISTRATIVE PROCEEDINGS

The defendant contends that the plaintiff is not entitled to any recovery in this case because of a decision that was rendered by the Armed Services Board of Contract Appeals on September 29, 1959, in connection with the four contracts that are involved in this case and certain other contracts.

During the period between December 17, 1956, and February 27, 1957, the plaintiff submitted to the Signal Corps a series of letters requesting equitable adjustments under the "changes" provisions of 10 contracts with the Signal Corps, including the four contracts that are involved in the present litigation. In each letter, the plaintiff's request stated in part as follows:

In accordance with the provisions of, and under the procedures governing subject contract, your contractor respectfully requests that a Supplemental Agreement be executed, implementing certain Changes * * * which were effected by the Government during operations under subject contract. Said Supplemental Agreement should include an equitable adjustment in the contract price, compensating your contractor for costs incurred as a result of those changes.

With respect to the four contracts that are involved in the present case, it is pertinent to note that the plaintiff's requests to the Signal Corps for equitable adjustments sought redress for (among other things) the incidents which now form the bases of the claims asserted by the plaintiff before the court.

Contracts 45928 and 46999 contained identical paragraphs numbered 12 and 14 dealing with the subjects of "changes" and "disputes," respectively, in the following language:

Where the supplies to be furnished are to be specially manufactured, in accordance with drawings and specifications, the Contracting Officer may at any time, by a written order, and without notice to the sureties, if any, make changes in the drawings or specifications. Changes as to shipment and packing of all supplies may also be made as above provided. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly, provided claim therefor is asserted at any time prior to the date of final settlement of the contract.

\* \* \* \* \* \*

Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision or that of his designated representative, representatives, or

board shall be final and conclusive upon the parties hereto. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.

Contracts 873 and 4661, as well as six other contracts that were involved in the administrative proceedings, also contained identical paragraphs dealing with the subjects of "changes" and "disputes." They were paragraphs 2 and 12, respectively, of the "General Provisions" of each of these contracts, and they stated as follows:

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes." * * *

 * * * * * *

Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive * * *.

In 10 decisions, each dated July 12, 1957, the contracting officer denied the plaintiff's requests for equitable adjustments on the ground that the claims were not timely. The plaintiff appealed to the Secretary of the Army from the actions of the contracting officer.

The plaintiff's appeals were consolidated by the Armed Services Board of Contract Appeals (acting for the Secretary of the Army) and were disposed of by the ASBCA in a decision dated September 29, 1959 (ASBCA Nos. 4523–4532). The ASBCA gave detailed consideration to only two appeals—ASBCA Nos. 4531 and 4524, relating to contracts 46999 and 4661, respectively—as the plaintiff stipulated that if the ASBCA were to dismiss these two proceedings on jurisdictional grounds, it could at the same time dismiss the other appeals on the same grounds without reaching the merits.

The Armed Services Board of Contract Appeals dismissed the plaintiff's appeals on the ground that the claims for equitable adjustments under the "changes" provisions of the several contracts were not timely, in that such claims had not been asserted "prior to final payment under" or "prior to the date of final settlement of" the respective contracts; and, therefore, that the ASBCA was without authority to grant the relief sought.

The ASBCA's decision included 44 numbered "Findings of Fact." How-

ever, neither the plaintiff nor the defendant requested that any of the administrative "Findings of Fact" be incorporated in and made a part of the court's findings of fact in the present case. (In this connection, see paragraphs (c)(1) and (f)(2) of Rule 57.) The defendant's requested findings of fact did contain a proposed conclusional finding (No. 122) to the effect that:

> Under the Wunderlich Act, 41 U.S.C. 321, the findings of fact of the ASBCA in Nos. 4531 and 4524 have become final and conclusive in the absence of any assertion that such findings are not supported by substantial evidence.

With respect to this requested finding, it would be meaningless to state in the court's findings of fact that "the findings of fact of the ASBCA * * * have become final and conclusive" without setting out the specific administrative findings (if any) which have become final and conclusive, and which must be given effect by the court in disposing of the litigated case. Consequently, since both the plaintiff and the defendant, in their requested findings of fact, ignored the ASBCA's "Findings of Fact" (except for the defendant's requested conclusional finding No. 122) and instead asked for factual findings from the court based upon the evidence that was introduced in the litigated case, there is no occasion for the court to determine whether the ASBCA's "Findings of Fact" are or are not entitled to finality under the "disputes" provisions of the respective contracts, under Section 1 of the so-called Wunderlich Act (41 U.S.C. § 321 (1958)), and under the Supreme Court's decision in the case of United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

■ However, the decision of the Armed Services Board of Contract Appeals to the effect that the plaintiff was not entitled to equitable adjustments under the "changes" provisions of the several contracts, because the plaintiff's claims in this respect had not been asserted in a timely manner, was clearly correct. The plaintiff agreed to the fixing in each "changes" provision of a final deadline for the assertion of a claim for an equitable adjustment under such provision. In this connection, the identical "changes" provisions in contracts 45928 and 46999 each stated that a claim for an equitable adjustment must be asserted "prior to the date of final settlement of the contract"; and the identical "changes" paragraphs in contracts 873 and 4661 each stated that such a claim must be asserted "prior to final payment under this contract." Since the evidence before the ASBCA and before the court shows that the plaintiff received final payment or settlement for each of the contracts involved in this litigation sometime prior to December 17, 1956, it is clear that the plaintiff was too late when it first began to seek relief under the "changes" provisions of the several contracts during the period December 17, 1956–February 27, 1957.

■ Furthermore, the matters now at issue before the court were outside the scope of the "changes" provisions of the contracts; and the plaintiff was mistaken in its attempts to secure equitable adjustments respecting such matters. The "changes" provisions in contracts 45928 and 46999 related to "changes in the drawings or specifications" and "Changes as to shipment and packing"; and the "changes" provisions in contracts 873 and 4661 related to changes in "(i) drawings, designs, or specifications * * *; (ii) method of shipment or packing; and (iii) place of delivery." The defendant's defaults that form the bases of the present action—i. e., the failure to act on the plaintiff's preproduction samples under contract 46999 within 55 days (first count), the failure to furnish the plaintiff with a model of the power rectifier within 50 days after the award of contract 4661 (third count), the failure to act within a reasonable period of time on the request for permission to use nonstandard power transformers under contract 45928 (fifth count), the failure to furnish I–56–K test sets within 30 days after the award of contract

45928 (fifth count), and the failure under contract 45928 to assign nomenclature and stock and code numbers within 30 days after the plaintiff supplied descriptions (fifth count)—did not fall within any of the categories covered by the "changes" provisions of the several contracts.

▉ The circumstance that the plaintiff, with respect to the defendant's defaults previously mentioned, made an untimely effort to obtain from the administrative agency a remedy that was unavailable anyway does not preclude the plaintiff from instituting and maintaining a legal action based upon the breaches of the several contracts by the defendant. See Universal Ecsco Corp. v. United States, 345 F.2d 586, 170 Ct.Cl. —— (May 1965). A claimant is not restricted to a "one-shot" or "sudden death" attempt to obtain relief. Even when proceeding before this court, a claimant may, regardless of consistency, assert two or more alternative theories of recovery. (See Rule 13(a)(2).)

As previously indicated, the recited defaults of the defendant constituted breaches of the several contracts. The decision of the Armed Services Board of Contract Appeals dated September 29, 1959, did not attempt to determine the validity of claims based upon such a theory. Furthermore, if the ASBCA had purported to make determinations concerning such matters, the administrative determinations would have been denied finality by the terms of the Disputes clause and by Section 2 of the Wunderlich Act (41 U.S.C. § 322 (1958)), which states that:

> No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

Therefore, the decision dated September 29, 1959, by the Armed Services Board of Contract Appeals does not constitute any impediment to the granting of relief by the court in the present case for the damages sustained by the plaintiff on account of the defendant's breaches of three of the contracts that are involved in the present case.

## DAMAGES

### General

The plaintiff incurred a loss (excess of costs over contract price) of $175,300.48 in performing contract 46999, a loss of $18,787.46 in performing contract 4661, and a loss of $148,644.47 in performing contract 45928. There is no basis in the record, however, for attributing the full amounts of these losses to the defendant's breaches of the several contracts. Actually, although the evidence in the record makes it very clear that the defendant's defaults were financially damaging to the plaintiff, it is equally clear that the losses previously mentioned were also attributable in substantial part to factors for which the defendant was not legally responsible.

At the time when the plaintiff was awarded contract 45928 on May 26, 1949, the plaintiff was without prior experience in the manufacture of electronic equipment. The plaintiff had done work for the Signal Corps during World War II, but that work had involved matters of mechanical, rather than electrical, engineering. After World War II, the plaintiff ceased to engage in active operations and became dormant owing to lack of work.

The plaintiff was reactivated in 1948. It was felt at the time that, because of the prior acquaintance with the Signal Corps' methods of operation, the plaintiff's best chance for success would be in working with the Signal Corps.

Accordingly, the plaintiff began an active campaign to obtain contracts with the Signal Corps. The success of this effort is indicated by the fact that contracts aggregating approximately $5,600,000 were obtained from the Signal Corps and performed by the plaintiff during the period 1949–1953.

In its attempts to obtain business from the Signal Corps, the plaintiff adopted the policy of assuming certain risks. Frequently, the prices quoted by the

plaintiff on prospective Signal Corps contracts were not based upon complete cost analyses because the necessary technical information was not available to the plaintiff. For example, some of the plaintiff's bids related to the production of items of equipment (e. g., those involved in contracts 45928, 46999, and 873) as to which the Signal Corps had merely furnished performance-type specifications, and it was to be the problem of the successful bidder in such a situation to design a piece of equipment that would perform in accordance with the pertinent specifications. The plaintiff, in submitting a bid under such conditions, could not accurately determine the prospective costs of manufacture because the design of the particular piece of equipment was not yet known and the plaintiff could not accurately compute the costs of labor, materials, etc. The plaintiff deliberately, and as a matter of policy, assumed a risk of financial loss in bidding under these circumstances.

### Contract 46999

Contract 46999 (first count) provided that deliveries of the multimeters under the contract should be completed on February 23, 1950, but the plaintiff did not actually complete its performance of the contract until May 1952. In the meantime, the Korean hostilities began for the United States on June 25, 1950, and this resulted in substantial increases in the prices and wages which the plaintiff had to pay for materials and labor.

Certainly, the defendant's default in failing to act on the preproduction samples within the time prescribed in the contract was not wholly responsible for the delay of more than 2 years in the completion of contract 46999. The plaintiff was in default itself to the extent of 5 months in the delivery of the preproduction samples, despite the fact that it had received assistance from the Bureau of Standards in the development of the instrument. In view of the plaintiff's relative inexperience at the time in the development and manufacture of electronic equipment, it is entirely reasonable to conclude that further substantial delay by the plaintiff in the performance of this contract would have occurred even if the defendant had not defaulted in acting on the preproduction samples. This inference is supported by the circumstance that after the pilot run ended and the plaintiff was in full production, it took the plaintiff 8 months to produce and deliver approximately 2,100 multimeters, whereas the contract contemplated that production deliveries would be completed in less than 3 months after they began. No part of this particular 5-month delay was attributable to the defendant.

There actually is no way of knowing when the plaintiff would have been able to complete the performance of this contract if the defendant had acted on the preproduction samples within 55 days after the samples were submitted in February 1950. Because of this, it is impossible to allocate with exactitude the responsibility for the plaintiff's loss of $175,300.48 on this contract, as between the defendant's breach of contract in failing to act on the preproduction samples within the prescribed period of time and other difficulties on the part of the plaintiff for which the defendant was not legally responsible.

However, this inability to determine the precise amount of the damages attributable to the Government's breach of contract does not preclude the court from entering a judgment for the plaintiff. The ascertainment of damages is not an exact science. Western Contracting Corp. v. United States, 144 Ct. Cl. 318, 320 (1958). Hence, it is not essential that the amount of damages be ascertainable with absolute exactness or mathematical precision. Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40, 44 (1944), cert. denied, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410. It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation. Hedrick v. Perry, 102 F.2d 802, 807 (10th Cir., 1939).

In estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties. United States v. Smith, 94 U.S. 214, 219, 24 L.Ed. 115 (1876).

With respect to contract 46999, it would be fair to allocate to the defendant responsibility for the portion of the delay in the performance of the contract that is represented by the period from the beginning of the defendant's default in April 1950 to the beginning of the pilot run in October 1950 pursuant to the agreement of the parties. This period constituted about 23 percent of the total delay.

On the basis indicated in the preceding paragraph, a jury-type award to the plaintiff of $40,319 (approximately 23 percent of the plaintiff's total loss on this contract) as damages for the defendant's breach of contract is warranted.

### Contract 4661

Under the provisions of contract 4661 (third count), it was to be completed by the plaintiff in October 1951. It was actually completed in December 1952. Thus, the plaintiff experienced a delay of approximately 14 months, and the plaintiff sustained a financial loss totaling $18,787.46 in performing this contract. However, the defendant was responsible for only 2½ months of the delay.

Accordingly, it would be proper to make a jury-type award of $3,382 (approximately 18 percent of the plaintiff's total loss on this contract) to the plaintiff as damages for the defendant's breach of contract 4661.

### Contract 45928

The plaintiff experienced a delay of 17 months in completing the performance of contract 45928 (fifth count) and the plaintiff's loss on the contract amounted to $148,644.47.

The defendant's breaches of this contract probably were responsible for about a fourth of the overall delay. Consequently, a jury-type award in the amount of $38,000 should be made to the plaintiff as damages for the defendant's breaches of contract 45928.

### CONCLUSION

For these reasons, a judgment for the plaintiff in the amount of $81,701 should be entered.