**BATH IRON WORKS CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 90–897C, 90–898C.**

United States Court of Federal Claims.

Sept. 28, 1995.

Robert H. Koehler, Washington, DC, for plaintiff.

Shalom Brilliant, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge:

## INTRODUCTION

Plaintiff, Bath Iron Works Corporation, following an adverse final decision of the contracting officer, filed these actions in this Court on September 7, 1990, seeking equitable adjustments on two shipbuilding con-

tracts with the United States. These matters are presently before the court for decision on the merits following a trial held on March 20–29, 1995, in Washington, D.C.

At trial, the primary issue for decision was—whether, and to what extent, plaintiff had in fact *incurred* compensable increased costs of performance on the contracts in issue as a result of an allegedly defective change order procedure by which modifications were made to the design of the ships during contract performance. As is more fully explicated below, we find that plaintiff has failed to meet its established burden of proof with respect to its alleged entitlement to an equitable adjustment. We are constrained to reach this conclusion because, as will be shown hereinafter, the probative evidence relied on by plaintiff to demonstrate the existence and extent of the injury, for which it seeks compensation, relates almost exclusively to a shipbuilding contract *not* at issue in these suits. In addition, plaintiff knowingly failed to introduce at trial probative evidence and testimony *in its possession or control* which it alleges would have supported its case. The court, therefore, is compelled to draw an adverse inference regarding the purported content of said unpresented evidence. As a consequence of all of the foregoing, plaintiff has simply failed in its proof that it experienced recoverable increased costs actually incurred in performing these contracts as a result of defendant's actions.

Moreover, plaintiff relies entirely on the so-called "jury verdict method" to prove the quantum of its claimed damages. However, as is demonstrated, *infra*, plaintiff has also failed to satisfy the obligatory legal requirements in order to prove its damages on this theory. Therefore, notwithstanding our resolution of the entitlement issue, we are bound to find in favor of defendant because plaintiff has failed to prove the quantum of its alleged damages with the specificity sufficient to permit the court to enter judgment for plaintiff. Accordingly, judgment shall be entered for defendant.

## FACTS

### Background

Bath Iron Works (BIW), a Maine corporation with its principal place of business in Bath, Maine, was established in 1884 and is one of six major shipbuilders in the United States. The contracts at issue in this case were shipbuilding contracts awarded to BIW by the United States Navy, pursuant to the Navy's AEGIS[1] Cruiser Program ("Cruiser Program"). Under this program, BIW has constructed for the Navy a total of eight guided-missile cruisers, each equipped with the AEGIS combat and weapon system. BIW's first Cruiser Program contract was awarded in May 1982 for the construction of the USS THOMAS S. GATES (CG 51[2]). The initial BIW contract ("the CG 51 contract") was a cost-plus-award-fee contract. However, the consolidated cases at bar involve two subsequently-awarded Cruiser Program contracts, *i.e.*, the CG 58 contract, awarded in December 1983 for the construction of one cruiser (CG 58), and the CG 60 contract, awarded in November 1984 for the construction of four cruisers (CG 60, 61, 63 and 64). These latter contracts were fixed-price incentive contracts.

The first ship in the AEGIS Cruiser Program, the CG 47, was built by Ingalls Shipbuilding Division ("Ingalls"). By the terms of such contract with the Navy, Ingalls was designated the "Lead Yard." The Lead Yard is charged with the design and construction of the first ship in the class (the "lead ship"). The design of the lead ship establishes the initial "configuration base-

---

1. AEGIS is the name given to the sophisticated combat system first deployed in the Cruiser Program vessels. Because this combat and weapon system was the prime motivator in building the new cruisers at issue, the name AEGIS is applied generally to vessels containing that system.

(Joint Stipulation of Technical Terms (JSTT), p. 1).

2. "CG" is the designation given by the Navy to its guided-missile cruisers. In addition, the

line"[3] according to which subsequent ships are similarly built. As the Lead Yard, therefore, Ingalls was required to maintain and develop the configuration and design for the Cruiser Program as it evolved over time and from ship to ship. As the "Follow Yard," BIW received the detailed design documentation and specifications prepared by Ingalls. BIW then constructed its cruisers in accordance with the Ingalls-developed design, detail, and specifications that had been approved by the Navy.

From time to time during the production of the CG 47 Class[4] cruisers, changes were made in the design of these ships. Normally, the Navy would request a design change, which would then be initiated by Ingalls, the Lead Yard, by the creation and submission of an Engineering Change Proposal (ECP).[5] In general, the ECP Process involved the following steps:

(1) the preparation and submission of a design change proposal, along with accompanying documentation, (*i.e.*, the ECP) for approval or disapproval by the Navy;

(2) approval by the Change Control Board (CCB)[6], the Navy's reviewing authority; and

(3) following CCB approval of the ECP, the issuance by Ingalls of detailed drawing changes, referred to as Engineering Change Notices (ECNs), implementing the full scope of the change contained in the approved ECP.

When an ECP was submitted to the Navy, BIW was routinely provided with a copy. Customarily, an ECP would include: a description of the existing design proposed for change; specifications reflecting the design both pre- and post-change (called "is/was mark-ups"); a statement of the work required to effect the proposed change (the "work scope"); a list of materials and equipment to be added or deleted pursuant to the change; and an "Impact Statement" listing by identification number the specific drawings that would be affected by the ECP. Based on the ECP, BIW was required to develop and submit to the Navy a price proposal for the work contemplated in the ECP. Thereafter, and working from the price proposal, BIW would negotiate with the Navy's Supervisor of Shipbuilding[7] located in Bath, Maine (SUPSHIP Bath), to arrive at a final price to be paid to BIW as compensation for the extra work required by the ECP. If and when the CCB finally approved the ECP, the Navy contracting officer (CO) would then formally incorporate the ECP and its associated price into the appropriate contract by contract modification.

After Navy approval of an ECP, Ingalls would then develop ECNs to incorporate the approved change into the ship's design. The ECNs contained the specific detailed design drawings affected by the initiating ECP, both as originally issued and as changed by the ECP (is/was), as well as lists of materials to be added or deleted. These ECNs, which were issued to implement a change provided for in an ECP, were called "Class I ECNs."

cruisers are numbered sequentially in the order of their contract award.

**3.** The "configuration baseline" refers to the general design and technical specifications of the cruiser. (JX 1, ¶ 3).

**4.** Because CG 47 was the first ship constructed in the Cruiser Program, the class of ships constructed under the program is referred to as the CG 47 Class. All of the ships at issue in this case were in the CG 47 Class. Within said class, the design of the vessels is *not* uniform as the design evolves from ship to ship; moreover, technological upgrades are incorporated into later Cruiser Program vessels.

**5.** In the Cruiser Program, any party (Ingalls, BIW, or the Navy) could request a change in the design of the cruisers. Accordingly, BIW devel-

oped some ECPs when it felt that a design change was necessary or desirable.

**6.** Also referred to as the Configuration Control Board (CCB), defined in the JSTT as: "The functional body within NAVSEA, Program Management, or SUPSHIP responsible for reviewing and approving/disapproving change proposals...." (JSTT pp. 1–2).

**7.** This title refers to both an office within the Department of the Navy and the individual Navy officer in charge of the office. As used herein, "SUPSHIP Bath" refers to the office responsible for overseeing the contracts at issue in these cases.

In addition to Class I ECNs, there were also ECNs that were issued without any authorizing ECP, usually to correct minor defects in previously-issued drawings, called "Class II ECNs." BIW received these ECNs (both types) from Ingalls, to be implemented in the construction of the BIW-awarded cruisers.

Because Class II ECNs were issued independent of any ECP, no price or compensation for the change had as yet been agreed to at the time BIW first received a given Class II ECN. Accordingly, BIW's Estimating Department grouped together "packages" of Class II ECNs (usually about 50–100) and estimated the cost of the work contained therein. These estimates were then submitted to the Navy as price proposals for the package. On the other hand, Class I ECNs did not need to be estimated because BIW had already been compensated for that work pursuant to the ECP price negotiation process described above.

*Late, Additional, and Expanded–Scope ECNs*

Under the Cruiser Program design change procedure, BIW expected to receive *one* ECN for *each* drawing listed in the Impact Statement of the initiating ECP. However, in May 1985, BIW discovered that, in practice, for some ECPs, BIW was in fact receiving more ECNs than the number of drawings listed as being affected by the ECP. Furthermore, some of the ECNs were discovered to depict changes *not listed* in the associated ECP, *i.e.*, beyond the work scope of the authorizing ECP. Finally, BIW also determined that some ECNs were being issued later than the issue date provided for in the ECPs.

To confirm and ascertain the extent of this newly-discovered ECN problem, in late May or early June 1985, BIW's Systems Engineering Department roughly selected 53 ECPs, 47 of which had been approved by the Navy's CCB. Some of the 47 approved ECPs were applicable only to CG 51, while others were applicable to one or more of the later hulls (*i.e.*, CG 58, 60, 61, 63 and 64).[8] Using these 47 approved ECPs, BIW engi-

neers found that 502 drawings were listed as affected by these ECPs in their Impact Statements. When the engineers counted the number of related ECNs that had actually been received pursuant to the 47 approved ECPs, they found that a total of 740 ECNs had been received. Based on this rough analysis, called a "bean count," BIW concluded that there was a systemic problem with the ECP process causing BIW to receive excess ECNs which increased the initial scope of work.

Therefore, in June 1985, BIW informed the Navy of its bean count survey and its belief that the ECP work scopes were increasing between the time when BIW priced the ECP and when BIW eventually received the implementing ECNs. Thereafter, the Navy and BIW continued to meet to discuss ways to change the ECP procedure, as well as various approaches to compensate BIW for any expanded work required by the extra ECNs. One proposal, embodied in a draft Memorandum of Agreement (MOA), was to treat the extra ECNs similarly to Class II ECNs. For example, BIW would make monthly submissions showing the number of excess ECNs received. These submissions would then form the basis for negotiating contract price adjustments. However, this draft MOA was never adopted by the parties.

After a period of review and discussion (from July 1985 and August 1986) between BIW, Ingalls, and the Navy concerning the defects in the ECP procedure, the Navy issued a new ECP procedure in August 1986. Under the new procedure, the ECPs were not priced by BIW until all of the implementing ECNs had been received by BIW and approved by the Navy. For ECPs issued after the implementation of the new procedure, BIW found that the problems with additional, expanded-scope, and late ECNs were effectively eliminated.

Following thereafter, in November 1986, BIW submitted a single global price adjustment proposal of approximately $100 million to settle with the Navy all increased cost problems related to the Cruiser Program.

8. BIW's witness testified that he could determine how many of these ECPs applied to CG 51 only and how many of these ECPs related to CG 58 and follow. However, he never provided this information to the court. Nor did any other witness.

However, on May 18, 1987, BIW revised its proposal and submitted a Request for Equitable Adjustment (REA) to the Navy, identifying 15 separate line items for various Cruiser Program issues. The fifteenth of these line items was a new addition. It represented the late, additional, and expanded-scope ECN issue (*i.e.*, the issues at bar), which came to be referred to as "REA 15." At this time, REA 15 was unaccompanied by supporting documentation.

Subsequently, BIW and the Navy agreed that REA line items 1–8 and 15, as pertained to the CG 58 and 60 contracts, would be removed from the Cruiser Program REA and negotiated with SUPSHIP Bath "in the normal course of business." The remaining items (*i.e.*, line items 9–14) were settled for approximately $30 million. In addition, this settlement agreement resolved all issues under the CG 51 contract, including REA 15 as it related to that vessel. The settlement was incorporated into the two contracts at issue (*i.e.*, the CG 58 and 60 contracts) by modifications, signed in September 1987 but effective June 1987. Thereafter, line items 1–8 were resolved by the parties "in the normal course of business."

Previously, on April 20, 1987, at a meeting between BIW and Navy representatives in Washington, D.C., BIW presented its computer tab runs[9] to the Navy in order to demonstrate that BIW was receiving late and additional ECNs. As a result of this meeting, the Navy asked BIW to analyze *a random sample of the applicable ECNs* to obtain an estimate of the extent of the problem. At this time, REA 15 had not yet been resolved with respect to CG 51, so that BIW and the Navy were interested in and, therefore, sampled ECNs applicable to CG 51 as well as CG 58, 60, and follow (*i.e.*, the vessels or hulls at issue). In a June 18, 1987 letter to SUPSHIP Bath, BIW presented the results of its random sample analysis of ECNs, some of which were applicable to CG 51 and some of which were applicable to CG 58 and follow. This analysis revealed that BIW had received some late ECNs as well as some ECNs that were in addition to the number expected to be received for a particular ECP. However, the random sample analysis did not, and could not, identify whether any of the ECNs called for additional work not provided for in the authorizing ECP (*i.e.*, expanded-scope ECNs). Furthermore, this ECN-level analysis did not determine or even address whether any of these late and additional ECNs increased BIW's performance costs on CG 58 and follow.

Therefore, in mid–1987, the parties began to discuss possible methodologies by which BIW could confirm that it had been harmed (*i.e.*, incurred increased costs of performance) and quantify that harm. In order to identify any expanded-scope ECNs and ascertain whether, and to what extent, BIW had been harmed, *the ECPs would need to be analyzed.* BIW estimated that it would take between 30,000 and 40,000 man-hours, at a cost of approximately $1 million, to do a full evaluation of all the ECPs to estimate any additional costs. Consequently, it was proposed that a random sample of ECPs be analyzed.

*BIW's Random Sample Analysis*

At a June 17, 1987 meeting in Washington D.C., the Navy and BIW agreed to take a random sample of all of the ECPs issued to BIW under the old (pre-August 1986) ECP procedure.[10] There were approximately 1,350 ECPs in this "universe," applicable to one or more of CG 51, 58, 60, 61, 63 and 64. The Navy, using its random sampling software, generated several random samples of varying sizes, corresponding to different "confidence levels" and "error rates."[11]

---

9. These are the printed, hard-copy output of data from a computerized database. (JSTT p. 5).

10. This population of ECPs from which the random sample was drawn was referred to as the "universe." This universe of ECPs encompassed all ECPs, applicable to CG 51, 58, 60, 61, 63 and 64, issued from the date of contract award for CG 51, in May 1982, to the changing of the ECP procedure in August 1986.

11. In the context of a scientific random sample, the "confidence level" and "error rate" are measures of the accuracy or precision of the measurement derived from the sample as an estimate of the actual measurement for the total population about which one is attempting to generalize from the random sample. For example, a sample size that corresponds to a 90% confidence level and an error rate of +/− 5% will produce a value that 90 times out of 100 will fall within

These samples consisted of randomly generated numbers between 1 and the total number of ECPs in the universe (about 1,350). After receiving these computer generated samples from the Navy, BIW elected to conduct a review therefrom of a sample of 45 ECPs. This sample size of 45 out of a universe of approximately 1,350 ECPs corresponded to a confidence level of 90% with an error rate of +/− 5%.

For this universe of ECPs, BIW sequentially numbered (*e.g.*, 1 through 1,350) each ECP. Taking the 45 random numbers generated by the Navy, BIW then selected the corresponding ECPs. Lewis Kingsbury, a BIW employee who testified at trial, was charged with the responsibility of carrying out the study of these 45 ECPs. He began by collecting the 45 ECPs and their total associated ECNs. This process took Mr. Kingsbury several months. In collecting the ECNs, he utilized both a BIW computer printout which listed the ECNs received from Ingalls associated with each of the 45 ECPs and a similar document generated on the Ingalls computer system. He found the Ingalls printout, of the two, to be more complete. In addition, this document included in its listing Direct Vellum Changes (DVCs) made pursuant to each ECP. A DVC is a modification to a detailed design drawing incorporated directly onto the master reproducible copy of the drawing (known as the "mylar") without the prior issuance of an ECN. (JSTT p. 2). Thus, the DVCs represented changes to the ship design of which BIW had *not* received notice. Mr. Kingsbury, therefore, also collected the DVCs, in addition to the ECNs, associated with each related ECP.

After compiling this information, Mr. Kingsbury provided it to a group of four BIW estimators who, under his supervision, performed an analysis of the 45 ECPs and related ECNs. For this analysis, the estimators compared the work scope and material lists provided in the ECPs as originally adjudicated (*i.e.*, as negotiated and agreed to by BIW and the Navy) with the work and materials delineated in the associated ECNs and DVCs. From this comparison, the estima-

tors determined whether any additional work or materials had been required by the ECNs and DVCs that had *not* been called for in the initiating ECP. For each ECP where additional work and/or materials were judged to have been required by the related ECN, the estimators prepared a cost estimate of the increase, using the production standards, labor rates, and material prices that were in effect at the time the original ECP was adjudicated. In performing this comparison, the BIW estimators reviewed the individual components of the ECPs, factoring in any increases or decreases in work, materials, or labor caused by the ECNs and DVCs. This review, with respect to the 45 ECPs and related ECNs, took about six to eight weeks to complete and involved daily consultations with Mr. Kingsbury.

Thereafter, on February 17, 1988, BIW submitted a *certified* REA to the Navy, alleging entitlement to compensation for the *extra costs* of late, additional, and expanded-scope ECNs. As supporting documentation for this REA, BIW included the results of its random sample analysis of ECPs. After comparing the original, negotiated price ($616,029) of the 45 ECPs with an estimated cost ($176,554) of performing any excess work contained in the ECNs and DVCs (the "design growth"), BIW arrived at a "design growth" percentage (*i.e.*, the estimated percentage increase in cost of performing the expanded-scope ECNs). This design growth figure represented a 28.7% increase in costs ($176,554 ÷ $616,029) associated with the related ECNs and DVCs over the original price of the 45 ECPs.

Of the 45 ECPs reviewed by BIW, six applied exclusively to CG 51, which had by this time been completely settled. Furthermore, nearly all of the remaining ECPs (*i.e.*, 39) were also applicable to CG 51 *in addition to some or all of the later hulls* (*i.e.*, CG 58, 60, 61, 63 and 64, the hulls constructed pursuant to the contracts at issue here). This is a critical point because, when comparing the work contained in the related ECNs and DVCs to the work priced in the originating ECP, BIW used the ECNs and DVCs issued

5% of the actual value for the entire population or universe. (JSTT pp. 5–6).

for the "first hull of applicability." [12] There were two separate sets of drawings (ECNs) issued by Ingalls to implement a single ECP when it applied to CG 51 as well as to one or more subsequent BIW hulls, *i.e.*, one for CG 51 and one for CG 58 and follow. In other words, when an ECP applied to CG 51 alone, and in addition to subsequent hulls such as CG 58 and/or 60 and follow (as was nearly always the case), BIW was estimating the increased cost of performing the ECNs and DVCs associated with that ECP on CG 51 rather than the vessels at issue in this case, CG 58, 60 and follow.

Then, having thus derived a design growth estimate, BIW applied that percentage (28.7%) to each individual ship. For each hull at issue, BIW had totalled the cost, fee, and price [13] for all ECPs applicable to each ship adjudicated under the pre-August 1986 procedure. After multiplying these totals by the design growth percentage, BIW further multiplied these figures by standard rates for "local engineering and production disruption" as well as "cumulative disruption." [14] The final total represented the injury that BIW alleged that it had suffered on each ship due to late, additional, and expanded-scope ECNs and DVCs. For example, BIW's results pertaining to CG 58, 60, 61, 63, and 64 were presented in the February 1988 REA as follows:

### *ESTIMATED COMPENSATION DUE BIW:*

| CG 58 | COST | FEE | PRICE |
|---|---|---|---|
| 1. Adjudicated Activity: | $7,506,346 | $1,218,365 | $8,724,711 |
| 2. Estimated Change Growth: | × 28.7% | × 28.7% | × 28.7% |
| | $2,154,321 | $ 349,671 | $2,503,992 |
| 3. Local Eng. & Prod. Disruption: | × 143.7% | × 143.7% | × 143.7% |
| | $3,095,759 | $ 502,477 | $3,598,236 |
| 4. Cumulative Disruption: | × 122.8% | × 122.8% | × 122.8% |
| 5. Total: | $3,801,592 | $ 617,042 | $4,418,634 |

12. This is the first ship affected by a design change.

13. The "cost" figure represents BIW's cost of performing all the adjudicated ECPs for a specific vessel under the old ECP procedure. The "fee" is a percentage of cost and represents BIW's profit on the work. Finally, the "price" is equal to the sum of the cost and fee. These figures were negotiated and agreed to by the Navy and BIW pursuant to the pre-August 1986 change procedure.

14. In general, disruption consists of the cost impact of performing changed work on the performance of unchanged work. "Local disruption" includes costs that are attributable to inefficient performance of unchanged work in the vicinity of and caused by the performance of specific changes, while "cumulative disruption" is the impact of *multiple* changes on each other and unchanged work. (JSTT pp. 6–7).

CG 60

| | | COST | FEE | PRICE |
|---|---|---|---|---|
| 6. | Adjudicated Activity: | $1,597,294 | $ 262,713 | $1,860,007 |
| 7. | Estimated Change Growth: | × 28.7% | × 28.7% | × 28.7% |
| | | $ 458,423 | $ 75,399 | $ 533,822 |
| 8. | Local Eng. & Prod. Disruption: | × 113.4% | × 113.4% | × 113.4% |
| | | $ 519,852 | $ 85,502 | $ 605,354 |
| 9. | Cumulative Disruption: | × 118.4% | × 118.4% | × 118.4% |
| 10. | Total: | $ 615,505 | $ 101,234 | $ 716,739 |

CG 61

| | | COST | FEE | PRICE |
|---|---|---|---|---|
| 11. | Adjudicated Activity: | $ 597,346 | $ 102,498 | $ 699,844 |
| 12. | Estimated Change Growth: | × 28.7% | × 28.7% | × 28.7% |
| | | $ 171,438 | $ 29,417 · | $ 200,855 |
| 13. | Local Eng. & Prod. Disruption: | × 107.9% | × 107.9% | × 107.9% |
| | | $ 184,982 | $ 31,741 | $ 216,723 |
| 14. | Cumulative Disruption: | × ——% | × ——% | × ——% |
| 15. | Total: | $ 184,982 | $ 31,741 | $ 216,723 |

CG 63

| | | COST | FEE | PRICE |
|---|---|---|---|---|
| 1. | Adjudicated Activity: | $ 391,298 | $ 69,949 | $ 461,247 |
| 2. | Estimated Change Growth: | × 28.7% | × 28.7% | × 28.7% |
| | | $ 112,303 | $ 20,075 | $ 132,378 |
| 3. | Local Eng. & Prod. Disruption: | × 105.4% | × 105.4% | × 105.4% |
| | | $ 118,367 | $ 21,159 | $ 139,526 |
| 4. | Cumulative Disruption: | × ——% | × ——% | × ——% |
| 5. | Total: | $ 118,367 | $ 21,159 | $ 139,526 |

CG 64

| | | COST | FEE | PRICE |
|---|---|---|---|---|
| 6. | Adjudicated Activity: | $ 317,045 | $ 59,890 | $ 376,935 |
| 7. | Estimated Change Growth: | × 28.7% | × 28.7% | × 28.7% |
| | | $ 90,992 | $ 17,188 | $ 108,180 |
| 8. | Local Eng. & Prod. Disruption: | × 101.1% | × 101.1% | × 101.1% |
| | | $ 91,993 | $ 17,377 | $ 109,370 |
| 9. | Cumulative Disruption: | × ——% | × ——% | × ——% |
| 10. | Total: | $ 91,993 | $ 17,377 | $ 109,370 |

(PX 18, pp. 33–34). Thus, BIW alleged that it was entitled to an equitable adjustment in the amount of approximately $4.4 million on the CG 58 contract. Similarly, BIW alleged that it was entitled to roughly $1.2 million on the CG 60 contract (for CG 60, 61, 63 and 64). It took Mr. Kingsbury and the estimators about six months to complete the analysis of the random sample and prepare BIW's February 1988 REA.

*BIW's Certified Claim*

In the summer of 1989, the Navy reviewed BIW's February 1988 submission and prepared a Technical Advisory Report (TAR), dated July 7, 1989, setting forth the results of the Navy's review. Two Navy employees were involved in performing the review and preparing the TAR. They reviewed BIW's documents at BIW's facilities, receiving full cooperation and access from BIW. After receiving the TAR from the Navy and reviewing the comments and conclusions contained therein, BIW concluded that most of the TAR objections to the February 1988

REA were incorrect, but that some of the comments were valid. Accordingly, BIW revised the amount of its claim for equitable adjustments.[15] On November 13, 1989, BIW submitted a certified claim[16] to the Navy, reflecting the revisions to the February 1988 REA made in light of the TAR, in the amount of approximately $4 million for the CG 58 contract and $1.5 million for the CG 60 contract.

On July 20, 1990, the CO issued his final decision denying BIW's claim in its entirety. Finally, on September 7, 1990, BIW filed these actions in this Court. At trial, BIW introduced documentary exhibits into evidence and presented testimony from: Stephen Adams, a BIW employee and head of Systems Engineering during the time period when the ECN problem was discovered by BIW; Mr. Kingsbury, the BIW employee who was in charge of the random sample analysis of the 45 ECPs; and Stephen Jacunski, the Navy CO at SUPSHIP Bath. The government elected not to present a case-in-chief and called no witnesses.[17]

15. The revision to the amount of BIW's claim was due in part to a change in the design growth percentage used by BIW from 28.7% applied to all of the ships (CG 58 and follow) to 25.8% on CG 58 and 20.5% on CG 60, 61, 63 and 64. However, the underlying methodology used to compute the percentages remained the same. As is hereinafter explicated, that methodology was seriously flawed. The revision to the claim did not correct these flaws.

16. This was the first submission by BIW to be appropriately certified as a claim under the Contract Disputes Act. 41 U.S.C. § 605 (1988 & Supp. V 1993).

17. At the conclusion of plaintiff's case-in-chief, defendant moved for a directed verdict and judgment for failure of proof by plaintiff of the essential elements of a prima facie case. The court reserved ruling on said motion. Subsequently,

## CONTENTIONS OF THE PARTIES

### A. *Plaintiff*

In its post-trial memorandum, BIW makes two broad, principal contentions. First, BIW naturally contends that it has proven by a preponderance of the evidence that it is entitled to an equitable adjustment. Second, BIW further contends that it has proven, with sufficient specificity, the quantum of its damages through the use of a reasonable approximation derived from the random sample of ECPs.

With respect to the first contention, that BIW has established its entitlement to an equitable adjustment by the requisite burden of proof, plaintiff observes that, to prove entitlement, a party must demonstrate three essential elements, *i.e.*, liability, causation, and injury. BIW maintains that the parties' joint stipulations alone establish the first two of these elements. In that connection, the government has stipulated that BIW received ECNs that—(i) were in excess of the number identified in the Impact Statement of the initiating ECP; (ii) contained expanded work scopes over the content of the related ECP; and (iii) were late to the schedule established by the authorizing ECP. Based on these stipulations, plaintiff argues that it has succeeded in demonstrating both liability and causation by the requisite burden of proof. In addition, BIW avers that the evidence at trial proves that the government was responsible for the defective ECP procedure which resulted in the ECN problem. These collective facts, alleges plaintiff, establish defendant's liability for the ECP procedure which caused BIW to receive late, additional, and expanded-scope ECNs at additional and unanticipated costs.

Next, BIW argues that it has persuasively demonstrated that it in fact suffered a resultant injury from the foregoing defective ECP procedure. In this regard, BIW points primarily to its probative "random sample analysis" of 45 ECPs, which it contends clearly proves the existence of compensable injury on the contracts at issue before this court.

Plaintiff makes several allegations in this connection. For example, BIW maintains that the Navy recognized that it would be prohibitively expensive for BIW to conduct a full analysis of all the ECPs issued under the old procedure in order to confirm and quantify its injury. Furthermore, BIW alleges that the Navy agreed to BIW's random sampling methodology and, in fact, provided BIW with the random sample to be used at bar. Additionally, plaintiff argues that the Navy's TAR concluded, at the very least, that a 13.4% design growth figure was an acceptable measure of the harm experienced by BIW. Finally, BIW avers that the government never objected to BIW's methodology and allowed BIW to rely on it for more than three years. Thus, concludes plaintiff, it has demonstrated by a preponderance of the evidence that it has in fact suffered a resulting compensable injury.

Second, and in connection with the quantum of its proven damages, BIW contends that it is entitled to an award based upon evidence presented at trial that is sufficient to allow the court to make a reasonable estimate of the damages. In this connection, BIW relies solely upon the so-called "jury verdict method" of proving the quantum of its damages. In this respect, therefore, plaintiff argues that it has fulfilled the minimum requirements for a "jury verdict." Plaintiff maintains that it has shown clear proof of injury, as outlined above. Moreover, BIW alleges that it has demonstrated a justifiable inability to more accurately substantiate its damages. In support of this contention, BIW avers, as noted previously, that it would have been prohibitively expensive to do a complete analysis of the ECPs and their related ECNs. Finally, plaintiff concludes that it has adduced sufficient evidence to allow the court to make a fair and reasonable approximation of its damages, pointing out that the Navy regularly uses random sampling to estimate damages.

In sum and substance, therefore, BIW contends that the court must rule in its favor

---

defendant elected to rest without presenting a direct case-in-chief. Therefore, the issue before the court at the close of trial was precisely the same issue presented by defendant's motion.

Given our overall resolution of the trial issues, further consideration of defendant's motion is moot.

because it has succeeded in proving its prima facie case, while the government has offered no probative evidence in rebuttal.

### B. Defendant

In opposition, the United States argues vigorously that BIW has failed to meet its fundamental burden of proving both its entitlement to an equitable adjustment as well as the quantum of its alleged damages. First, with respect to BIW's burden of proof on entitlement, defendant counters that BIW has not presented evidence, *specifically related to the ships at issue before the court,* sufficient to meet said burden. Defendant notes, in short, that BIW has failed to demonstrate that any ECN applicable to CG 58, 60 and/or follow caused it to do additional work for which it was not compensated. Furthermore, contends the government, plaintiff has only introduced *one* ECN into evidence, and that ECN would more likely have *saved* BIW money on the ships and contracts at issue before the court. Rather, the United States argues that BIW's evidence relates almost exclusively to CG 51, a vessel which is not before this court. Finally, defendant asks the court to draw an adverse inference from the fact that BIW failed to introduce the ECNs, and related ECPs, which it alleges caused it harm.

Second, the government avers that plaintiff is clearly not entitled to a jury verdict award. In this regard, defendant contends that BIW has not met any of the elements necessary for such an award. In fact, BIW has failed, defendant argues, to produce the clear proof of injury required to obtain and sustain a jury verdict award. Moreover, the government maintains that more reliable methods of proving damages were unquestionably available to plaintiff. Finally, defendant contends that there is insufficient evidence in the record to allow this court to make a fair and reasonable approximation of BIW's alleged damages. Based upon all of these points, defendant concludes that this court is compelled to rule against plaintiff.

### DISCUSSION

In order to prevail in this matter, BIW must meet its burden of proof with respect to two distinct phases of this case. BIW must prove *both* its entitlement to the equitable adjustments it seeks on the contracts at issue before the court, as well as the quantum of its damages. We address each of these two phases separately below. Because we find that BIW has failed to meet its burden of demonstrating the existence of an injury on these contracts, we hold that plaintiff has failed to prove that it is entitled to any equitable adjustment on either contract. Moreover, even assuming proof of an injury, the court also finds, nevertheless, that BIW is not entitled to a damage award based on the "jury verdict method," because plaintiff has failed to satisfy the requisite minimum elements. We now turn to comprehensively explicate our findings and conclusions, seriatim, in connection with each aspect of this case, *i.e.,* entitlement and quantum.

### A. Entitlement

#### 1. Burden of Proof

■ It is well settled that a plaintiff must prove three elements in the Court of Federal Claims to receive an equitable adjustment to a contract with the United States Government, *i.e.,* liability, causation, and resultant injury. *Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir.1991); *Youngdale & Sons Constr. Co. v. United States,* 27 Fed.Cl. 516, 546 (1993). In short, a plaintiff must demonstrate that the government is liable for an act or omission which caused an injury to the plaintiff, normally, as in the case at bar, increased performance costs. *See Youngdale,* 27 Fed.Cl. at 546. At bar, BIW alleges that the United States is liable for the design change procedure put in place by the Navy on the AEGIS Cruiser Program, which procedure caused BIW to incur increased costs over those agreed to between the parties when BIW effected the required changes. Therefore, and to summarize, BIW must prove that the Navy caused it to do extra work for which it was not compensated.

Furthermore, BIW must make this showing, as to each element, by a preponderance of the evidence. *Delco Electronics Corp. v. United States,* 17 Cl.Ct. 302, 319 (1989). In

other words, BIW must prove that it is more likely than not that the defendant's acts or omissions caused BIW to incur increased costs in performing the CG 58, 60 and follow contracts. BIW contends that the parties' stipulations establish the government's liability and causation. In this regard, the parties have stipulated that, as a result of the ECP procedure established by the Navy, BIW received additional, expanded-scope, and late ECNs. However, even assuming, *arguendo,* that the stipulations alone (or in conjunction with the evidence presented at trial) establish liability and causation, BIW must still prove the final element, *i.e.,* resulting injury or damages, by a preponderance of the evidence.

Therefore, in order to prevail on the issue of entitlement, BIW must have adduced probative evidence at trial which makes it *more likely than not* that BIW incurred increased costs in performing the CG 58, 60 and follow contracts as a result of these additional, expanded-scope, and late ECNs. Because we find that the evidence in the record is totally insufficient to meet that burden, we are constrained to conclude that BIW has failed to prove its case.

### 2. Existence of Injury

In light of the foregoing, proof that BIW was *in fact injured* on the two disputed contracts is an indispensable and essential element of plaintiff's case. BIW attempts to prove this essential element by using the so-called random sample study that it conducted. However, the ECPs and the ECNs that were analyzed pursuant to that study were neither received nor offered into evidence. As a consequence, the court has no reasonably discernible way to *verify* that the estimates derived from the so-called random sample analysis are accurate, complete, and probative of any operative issues. This is particularly true inasmuch as BIW's study focused almost entirely on CG 51's ECPs and ECNs, which are the subject of a contract not at issue here, and is, therefore, not probative with respect to the contracts before the court. In fact, the record shows that only one ECN is in evidence (PX 9A), and that ECN would more likely have produced a

*cost savings* on CG 58, 60 and follow. For these reasons, our analysis, *infra,* compels us to hold that BIW has failed to prove, by a preponderance of the evidence, the existence of a compensable injury.

### a. BIW's Estimators' Worksheets Are Not "Summaries" of the ECPs and ECNs

While the ECPs and ECNs upon which the random-sample study was based were not introduced at trial, BIW nevertheless contends that the estimators' worksheets that it introduced (PX 80) are probative summary evidence of what those ECPs and ECNs contained, under Federal Rule of Evidence 1006. These worksheets contain the handwritten notes and calculations of the estimators and were prepared by them while analyzing the ECPs and ECNs to determine the extent to which BIW was required to perform work for which it was not compensated. We cannot agree that the worksheets are summaries for the purposes of Rule 1006.

Rule 1006 provides:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. Admission of summaries into evidence rests within the sound discretion of the trial judge. *Needham v. White Laboratories, Inc.,* 639 F.2d 394, 403 (7th Cir.1981). In order for a summary to be admitted, the proponent must lay the proper foundation, establishing four requirements. *Cf. White Indus. v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1070 (W.D.Mo.1985). First, the summarized writings must be so *voluminous* so as to be unable to be conveniently examined in court. *United States v. Duncan,* 919 F.2d 981, 988 (5th Cir.1990); *United States v. Robinson,* 774 F.2d 261, 276 (8th Cir.1985). Second, the underlying evidence must itself be admissible. *Martin v. Funtime, Inc.,* 963 F.2d 110, 116 (6th Cir.1992); *United States v. Johnson,* 594 F.2d 1253, 1255 (9th Cir.1979). Third, the original or

copies of the summarized writings must be made available to the opposing party. *Hackett v. Housing Authority of San Antonio,* 750 F.2d 1308, 1312 (5th Cir.1985); *United States v. Kim,* 595 F.2d 755, 764 (D.C.Cir.1979). And, fourth, the proposed summary (or chart or calculation) must accurately summarize (or reflect) the underlying document(s) and *only* the underlying document(s). *Vasey v. Martin Marietta Corp.,* 29 F.3d 1460, 1468–69 (10th Cir.1994); *United States v. Drougas,* 748 F.2d 8, 25 (1st Cir.1984); *Needham,* 639 F.2d at 403; *Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 301 (3rd Cir.1961). Because BIW failed to lay the proper foundation at trial, we hold that the estimators' worksheets are not summaries, under Rule 1006, of the ECPs or of the ECNs upon which they were based.

■ For the purposes of this discussion, we assume that the ECNs and ECPs were sufficiently voluminous and that they would have been admissible had BIW attempted to introduce them at trial.[18] However, BIW failed to establish the final two elements at trial, *i.e.,* that the original or copies of the underlying documents were made available at or before trial to defendant, and that the summary accurately reflected the underlying documents. The only evidence that BIW put forward on the requirement that the underlying documents (here the ECPs and ECNs) be made available to the opposing party was testimony that, during the preparation of the TAR, Navy personnel had access to the ECPs and ECNs upon which the random sample analysis was based. However, the TAR was prepared more than a year (*i.e.,* in 1989) before this action was even filed and over five years before trial. Moreover, the purpose of the requirement that the proponent of a summary make the underlying documents available to the opposing side is so that the opponent can ensure the accuracy of the summary and, if necessary, oppose the admission of the summary, cross-examine the foundational witness, or otherwise rebut the

summary with appropriate evidence. *Cf. United States v. Clements,* 588 F.2d 1030, 1039 (5th Cir.1979). Here, no evidence of record establishes that BIW ever made all of the relevant ECPs and ECNs available to the government after it proposed to offer the worksheets as summaries. Indeed, the first mention made by BIW that it intended to offer the worksheets as summaries was *at closing argument,* well after the worksheets had already been *independently* admitted into evidence (*i.e., not* as summaries). Thus, the government was never given an opportunity to verify the proposed summaries against all of the underlying probative ECPs and ECNs before the evidentiary record was closed.

■ Furthermore, proffered Exhibit 80 simply is not a Rule 1006 *summary* of the ECPs or the ECNs. These worksheets do not purport to specifically summarize the contents of the underlying ECP and ECN documents. Rather, they contain significant amounts of related and collateral information, as well as conclusions, not contained in the ECPs and ECNs. For example, the worksheets contain labor rates and prices for materials that were not contained in the design documentation being analyzed, but were incorporated by the estimators in preparing their cost estimates. The estimators used BIW parts catalogues to obtain the material prices used in the estimates. Furthermore, the estimators used production schedules given to them by Mr. Kingsbury in preparing the estimates. Finally, the worksheets also incorporated the subjective judgments or conclusions of the estimators as to what work delineated in the ECNs and DVCs was beyond the scope of the originating ECP. Legal precedent discloses that "summaries are … inadmissible if they contain information not present in the original or duplicate materials on which they are based." *Drougas,* 748 F.2d at 25. Therefore, because the

---

18. The evidence at trial indicates that there were approximately 1,350 ECPs and 10,000 ECNs in total. The record further shows that the 45 ECPs and related ECNs used in the random sample study occupied a volume equivalent to a "banker's box" (roughly 16 inches × 12 inches × 40 inches). Finally, it is likely that the ECPs and ECNs would have been admissible at trial as business records (Fed.R.Evid. 803(6)) because these documents were, by all appearances, prepared in the normal course of business by individuals with knowledge of the information contained therein.

worksheets contain additional information and material not present in the original underlying documents, they are simply not truly summaries of the ECPs or ECNs for the purposes of Rule 1006.

Pertinent to the foregoing is the fact that BIW failed to call any of the four estimators involved in preparing the worksheets to testify as to where the additional and/or collateral information contained in these documents was derived. More importantly, the ECPs and ECNs themselves were not before the court. Accordingly, there is an absolute dearth of evidence concerning not only the content and the accuracy of these purported summaries, but also their existence. Such failure provides this court with no way to verify whether the worksheets accurately reflected the contents of the ECPs and ECNs. As a consequence of all of the foregoing, BIW has failed to establish that the worksheets used in the random sampling were accurate summaries of the ECPs and ECNs.

Thus, BIW has failed to meet the basic foundational requirements for introducing into evidence a summary of voluminous writings under Rule 1006. The ECPs and ECNs were not made available to the government as required by Rule 1006, and there is no proof that the worksheets are *accurate summaries* of the underlying documents. They are not even summaries within the contemplation of Rule 1006. We cannot, therefore, accept BIW's contention that the estimators' worksheets are probative summary evidence of the corresponding ECPs and ECNs. These worksheets were, however, admitted into evidence simply as the back-up documentation prepared by BIW's estimators in the formulation of BIW's February 1988 submittal presenting the results of the random sample study. Nevertheless, without the ECPs and ECNs, the court has no way to cross-check or verify the accuracy of the random sample analysis upon which BIW bases its case.

### b. The Random Sample Study Relates Almost Exclusively to CG 51

■ Moreover, even assuming, *arguendo*, that the summary estimates were totally accurate, the random sample study related al-most exclusively to the CG 51 contract, and they are not probative of the existence of injury stemming from the CG 58, 60, and follow contracts at issue before the court. First, of the 45 ECPs evaluated in the random sample analysis, six applied exclusively to CG 51 and were not applicable to the vessels constructed pursuant to the contracts at bar. Of the remaining 39 ECPs, BIW's witness did not know whether they all applied to CG 51, or 58 and/or 60 and follow. As is explained below, we find that at least one-third of the 45 ECPs were included in the sample admittedly applied to CG 51, either alone or in conjunction with subsequent hulls. And with respect to the remaining two-thirds, plaintiff admittedly does not know whether the ECPs applied to CG 51 or not.

In BIW's February 1988 submission to the Navy, the 45 ECPs were listed on three pages of a document captioned "Results of BIW's SUPSHIP Bath's Random Sample Dated 6/25/87." At trial, Mr. Kingsbury testified, as previously noted, that the first six applied "to the CG 51 contract only." (Tr. 830; *see also* Tr. 835–38). Next, he stated that he did not know to which hulls the seventh ECP on the list applied. And, as to the eighth through the thirteenth ECPs on the list, Mr. Kingsbury explained that they applied to both CG 51 and CG 58, but that he did not know whether they applied to CG 60 and follow. Finally, as to the remaining ECPs listed on that page as well as those listed on the succeeding two pages (*i.e.*, the fourteenth through forty-fifth ECPs), Mr. Kingsbury testified that they were applicable to CG 58, but that he did *not* know whether they were also applicable to CG 51 and/or to CG 60 and follow.

In this connection, BIW's principal witness, after having explained that six of the 45 ECPs applied *exclusively to CG 51*, testified as follows:

> THE COURT: So, as you sit there, 38 of them [*i.e.*, of the remaining 39 ECPs] could very well relate primarily to CG 51 and 1 could relate to CG 58. Isn't that correct?

\* \* \* \* \* \*

THE COURT: You don't know as you sit there. Isn't that correct?

THE WITNESS: That's correct.

Therefore, it is highly probable that for nearly all (or even all) of the ECPs included in the sample, CG 51 was the first ship to which the ECP applied (*i.e.,* CG 51 was quite possibly the "first hull of applicability" for the overwhelming majority of the 45 ECPs in the sample).

Because *BIW chose to analyze only the ECNs and DVCs related to the first hull of applicability* for each ECP, BIW's estimators were comparing the original ECPs with the ECNs and DVCs issued pursuant to each for *CG 51* in every instance that an ECP applied to CG 51, whether or not it also applied to any other ship. In fact, plaintiff's witness, Mr. Kingsbury, could not even confirm that at least five of the 45 ECPs had been compared to ECNs and DVCs applicable to CG 58, 60 and/or follow. On recross examination, the following colloquy occurred between counsel for defendant and Mr. Kingsbury:

Q Out of the 45, do you know whether it was more than ten?

A More than ten what?

Q More than ten ECPs that were compared to ECNs issued for CG 58 and follow?

A I do not remember the ratio of CG 51 and CG 58.

Q At all?

A At all.

Q If I asked if [it] was more than five, would you be able to answer?

A More than five what?

Q More than five ECPs that were compared to ECNs issued for CG 58 and follow.

A I do not remember.

(Tr. 989–90). The foregoing record, therefore, clearly shows that BIW's own witness, who directed the random sample analysis, could not even testify as to how many ECPs in the sample were compared against CG 58, 60 and follow ECNs, the contracts in issue at bar. Because this information was clearly within the knowledge, possession, and control of BIW, and because BIW deliberately offered no clear evidence concerning how many of the ECPs in the sample were compared to ECNs and DVCs applicable to the ships at issue in this case (CG 58, 60 and follow), we are constrained to draw the inference that at most (and possibly fewer than) five of these ECPs were compared to CG 58, 60 and/or follow ECNs and DVCs. The record shows that only 19 of the 45 ECPs generated an ECN design growth increase. Thus, even giving plaintiff the benefit of the doubt that no more than five ECPs were compared to ECNs issued for CG 58, 60 and follow, it is not established that those five did not relate to the ECPs that had *"zero" design growth.*

Moreover, Mr. Kingsbury testified that he could not point to a single ECP in the 45 ECP sample that was compared to CG 58, 60 and follow ECNs and DVCs on which BIW incurred increased performance costs. Again, Mr. Kingsbury could not provide obviously relevant and probative information, testifying as follows:

Q As you sit here, could you point to any one or more ECPs and say to the Court that the dollars of design growth for that ECP were derived from ECNs and DVCs issued with respect to CG 58 and/or follow hulls?

A Without refreshing myself on the backup, no.

\* \* \* \* \* \*

Q Did you personally compare those ECNs and DVCs against the corresponding ECPs to determine whether and to what extent those ECNs and DVCs exceeded the scope of the ECPs?

A No. . . .

Q So from your personal knowledge, you don't know whether any of the ECNs and DVCs that these dollar figures are derived from in the design growth column actually exceeded the scope of the ECPs, do you from your own knowledge?

A Not from my own knowledge sitting here, no.

(Tr. 847–49). In addition to the foregoing shortfall, no other witness identified which, if any, of the ECPs in the sample were the particular ones that were compared against

CG 58, 60 and follow ECNs and DVCs. Thus, given such omissions, BIW has failed to establish for the record even a single ECP in its sample, for which the ECNs and DVCs, relative to CG 58, 60 and follow, caused it injury on the contracts at issue. Instead, BIW relies exclusively on a bland and generalized theory of compensable injury.

As a consequence of BIW's flawed approach and methodology, the results obtained by BIW from its random sample analysis relate solely to the estimated increase in performance costs on the CG 51 contract. This is so notwithstanding the fact that BIW is suing for equitable adjustments on the CG 58, 60 and follow contracts. Thus, it is apparent that plaintiff has adduced evidence concerning a contract (CG 51) that is not before the court. In the words of a familiar metaphor, BIW is simply attempting to prove a case establishing apples with evidence adduced respecting oranges. Against this background, BIW hospitably contends that CG 51, 58, 60, 61, 63 and 64 are all apples, i.e., it argues that what is true of CG 51 is equally true of the later ships and contracts. In order for the court to make such a broad generalization, the evidence must warrant such a herculean leap. In other words, the evidence must show that all of the ships' contracts were similarly affected by the design changes at issue in this matter. However, BIW has presented not one scintilla of evidence that this is in fact the case, asking or suggesting instead that the court engage in an unwarranted generalization. Indeed, and to the contrary, the evidence in the record indicates that there are several significant differences between the CG 51 contracted ship(s) and the subsequently contracted vessels at issue in this matter.

We begin by noting, for example, that, while the CG 51 contract, like the ships at issue in this matter, was part of the AEGIS Cruiser Program, even BIW estimated the costs of ECPs on a *ship-by-ship basis*. This suggests to the court that BIW believes that a design change applicable to several vessels can have a different cost impact on each vessel, thus the need to estimate each ship individually.

Furthermore, because the contracts for the various cruisers were awarded over a period of years, the ships under said contracts were undoubtedly in different stages of production at any given time. For instance, CG 51 was christened (December 14, 1985) before fabrication had even been started on CG 60 (April 27, 1986). At any rate, the important point is that, at all times relevant to this case, CG 51 was in a far more advanced state of production than were the subsequent cruisers, which are the subject of this action. As BIW's witnesses explained, an ECN that requires ripping out and reworking existing construction on an earlier, more advanced (in terms of its production schedule) ship, may require much less rip out and rework and may even save the shipbuilder the cost of initial procurement and installation on a subsequent ship that is not as advanced in its later construction. Thus, an ECN that causes a cost increase on an earlier vessel may not do so on a later one and may even produce a savings on the later ships.

In addition, BIW's witnesses testified that the design of CG 58, 60 and follow differed in a few important respects from the design of the earlier CG 51. First, as an example, CG 51 had "deck-mounted" missile launchers while CG 58, 60 and follow were "vertical launch ships." (Tr. 92–93, 867). What this means is that on CG 51 the guided missiles were to be launched from rotating, mobile launchers mounted on top of the deck, while on CG 58, 60 and follow the missiles were to be launched from silos (called cells) located beneath the deck. Obviously, this required the ships to be configured at least somewhat differently depending on which launch system was called for. Secondly, the CG 58, 60 and follow contracts were redesigned to effect a major weight reduction to those cruisers as compared to CG 51. This involved a significant rearranging of the ship design. Therefore, because the ships built under the contracts at issue had significantly different designs from CG 51, an ECN that caused a cost increase on CG 51 might not have had the same effect on the CG 58, 60 and follow contracts.

In sum, CG 51 had a different design from CG 58, 60 and follow, CG 51 was always at a

more advanced stage of production than the subsequent cruisers, and BIW, therefore, estimated its costs for ECPs on a ship-by-ship basis. In view of the foregoing, this court finds that an ECN that increased costs over the ECP price on CG 51 could just as easily have resulted in a cost savings or no change in cost on CG 58, 60 and follow. We conclude, therefore, that BIW's random sample study, the basis of its February 1988 and November 1989 submittals to the Navy, which related almost exclusively to CG 51, is simply not probative on the issue of whether BIW experienced any increased costs due to additional, expanded-scope, or late ECNs on the contracts before this court.

### c. The Lone ECN and Revision Notice in Evidence

██ BIW has adduced only one ECN into evidence, *i.e.*, PX 9A. That ECN was applicable to CG 52 and follow, including CG 58, and was issued pursuant to the single ECP (No. 47–3055) that BIW introduced into evidence, *i.e.*, PX 7. ECP No. 47–3055 was applicable to CG 48 and follow, up through CG 58, which was at that time the last hull affected by this ECP. Furthermore, ECP No. 47–3055 was one of the ECPs included in the random sample of 45 ECPs for which BIW determined that cost growth had occurred. BIW's witness, Mr. Adams, testified that the lone ECN in evidence affected a drawing not listed in the initiating ECP No. 47–3055. Thus, the ECN was additional to what was expected under the ECP and, accordingly, represents the type of ECN for which BIW is seeking compensation on the CG 58, 60 and follow contracts. As is explained below, however, we note that the only ECN that BIW has adduced would likely have produced labor and material cost savings on CG 58, 60 and follow rather than additional costs.

Because the ECN primarily involved the deletion of certain parts in CG 51 and follow, Mr. Adams testified that this ECN would most likely have saved BIW money on CG 58, 60 and follow. As the witness explained, the ECN was issued while CG 58 was still in an *early stage of production*. As a result, BIW most likely did not have to perform the initial installation of the items that were now being deleted. Although the ECN did include the addition of some cable to the design, Mr. Adams concluded that, given the deletions of cable and other items, it was likely that this ECN produced a cost savings for labor and materials on CG 58, 60 and follow. On the other hand, because ECP No. 47–3055 was also applicable to CG 51, as explained above, BIW utilized the ECNs issued for CG 51 (*i.e.*, the first BIW ship to which the ECP applied) pursuant to ECP No. 47–3055 when determining the cost growth for that ECP in their random sample analysis.

Therefore, to summarize, the lone ECN in evidence would likely have produced cost savings for BIW on CG 58, 60 and follow. That ECN was issued pursuant to an ECP included in the random sample of 45 ECPs. However, rather than utilize this ECN that would likely have produced a savings in estimating cost growth, BIW elected to use the ECNs issued for an earlier vessel (CG 51) not at issue in this case. While those ECNs applicable to CG 51 may have caused BIW to incur increased costs, the only ECN that is before the court is one that is applicable to a ship (CG 58) constructed pursuant to the contracts at issue, and that ECN would most likely have produced a cost savings on CG 58.

██ In addition, BIW introduced into evidence a Revision Notice (RN), which was the BIW document prepared upon receipt of an ECN from Ingalls, detailing the design change contained within that ECN. (PX 9B). Mr. Adams testified that this RN related to an ECN that was similar, but not identical, to the ECN that was introduced into evidence by BIW. He explained that the RN involved a similar change made to a different engine room of the ship. As with the ECN, Mr. Adams testified that the design change that gave rise to the RN in evidence involved mostly the deletion of materials. Again, this change was issued while CG 58 was in an early stage of production. Thus, Mr. Adams concluded that the change embodied in the RN would likely have produced a reduction in both material and labor costs on CG 58, 60 and follow. Therefore, while BIW has put forward its random sam-

ple analysis of 45 ECPs and their associated ECNs, which relates almost exclusively to CG 51, BIW's own witness has testified that the lone ECN and the RN introduced by BIW at trial would likely have resulted in cost savings on the contracts before this court.

### d. BIW's Arguments

 BIW argues that the Navy directed it to do a random sample analysis and agreed that the results would quantify BIW's injury respecting CG 58, 60 and follow. In this connection, BIW also alleges that the Navy agreed that BIW would use the ECNs issued for first hull of applicability of each ECP selected in the random sample, even if that ECN related to CG 51, a contract not at issue at bar. BIW further observes that the Navy never objected to this methodology used by BIW and allowed it to rely on the agreed-upon methodology for several years. Notwithstanding the foregoing, the court is unpersuaded as to the propriety of this line of argument. In the final analysis, we conclude that, in spite of any so-called agreement, BIW has failed to meet its burden of proving that it is more likely than not that BIW suffered an injury solely on the CG 58, 60 and follow contracts. Anything less than a contractually-binding agreement simply cannot transmute evidence regarding CG 51 into evidence applicable to CG 58, 60 and follow. In other words, unless the government specifically agreed to be irrevocably contractually bound by BIW's random sample study implicating CG 51 cost growth, the court must still find probative evidence in the record, *de novo*, that establishes the existence of an injury stemming from the CG 58, 60 and follow contracts in order for BIW to prevail on the entitlement issue.

First, we note that the evidence does not support the existence of such a contractually-binding agreement between the parties. Rather, BIW is simply seeking an equitable adjustment to its written contract. If there had in fact been a validly executed contractual agreement, an equitable adjustment would not be necessary as BIW could simply enforce the contract.[19] In this regard, we further observe that, because BIW is seeking an equitable adjustment after an adverse final decision by the CO, BIW must affirmatively prove its case in the Court of Federal Claims *de novo.* 41 U.S.C. § 609(a)(3); *Wilner v. United States,* 24 F.3d 1397, 1401 (Fed.Cir. 1994). *See also* 41 U.S.C. § 605(a) (findings of fact of the CO are not binding on the court). This means that BIW must prove its case by introducing a preponderance of evidence *relevant* to and probative of the fundamental issue in this case, *i.e.,* whether BIW incurred increased performance costs solely on the *CG 58, 60 and follow* contracts as a result of the defective ECP procedure. Without such evidence, BIW cannot prevail regardless of what the Navy allegedly agreed to with respect to other issues not before this court.

BIW points to its memorandum to CO Jacunski at SUPSHIP Bath dated August 11, 1987 (PX 58), as support for its proposition that the Navy agreed to its random sampling methodology. In furtherance thereof, it relies on language therein that reads as follows:

> BIW and SUPSHIP, Bath have mutually agreed to utilize a random sampling of ECPs to determine the percentage of growth difference between impact summary based estimates and actual design based estimates. The results of this random sampling will be basis for BIWs' [sic] definitized price *proposal* for this item.

(PX 58, p. 2) (emphasis added). Notwithstanding BIW's hospitable assertion, this limiting language clearly indicates that the random sample would be the basis of a *"proposal"* only, and nothing more. Nothing in this passage suggests that the Navy agreed to be legally and irrevocably bound by the results of BIW's self-serving analysis. Indeed, as Mr. Jacunski testified, the Navy understood that the random sample study would only be a starting point for negotiations, and not a dispositive solution.

---

**19.** In its reply brief, BIW surprisingly states that it is asking the court simply to enforce its "agreement" with the Navy. This contention is completely without merit. Nothing in the record points to the existence of a valid and mutually-binding collateral agreement between the parties.

Finally, any alleged preliminary "agreement" between the parties setting the stage for proffering a proposal occurred at the administrative stage, when the parties were merely attempting to ascertain the parameters of the scope of the problem and when CG 51 had not yet been settled by the parties and was still on the negotiating table. Even if, arguably, the Navy did agree to the use of the CG 51 ECNs when that cruiser was still being negotiated, this does not bind defendant to accept BIW's random sample study for all of the cruisers, especially because CG 51 has since been completely settled. For all of these reasons, we find that any alleged agreement by the Navy to BIW's methodology in analyzing the random sample (or any failure to object thereto) is simply not probative of whether BIW was in fact injured on the contracts at issue.

■■■ BIW also contends that even the Navy's TAR establishes at a minimum that a 13.4% growth factor in design change performance costs is appropriate, *i.e.,* that BIW was injured, at least, to that extent. However, the TAR was admitted into evidence, by agreement of counsel for both parties, on a limited basis. More importantly, the TAR was *not* admitted to prove the truth of the matter asserted (*i.e.,* 13.4% growth). This fact alone precludes the court from substantively considering BIW's argument concerning the TAR. Moreover, the testimony at trial makes clear that the Navy analysts who prepared the TAR were simply evaluating BIW's random sample study on its own terms. In other words, the TAR did not address, for example, the objectionable fact that BIW primarily used the ECNs related to CG 51 in conducting its study, a ship and contract not relevant to the case at bar. Therefore, even *if it were fully admissible,* the most the TAR proves is that BIW experienced an approximately 13% increase in its performance costs *on its CG 51 contract.* The TAR does not, and cannot, change the fact that BIW's random sample study deals almost exclusively with CG 51, rather than the contracts at issue in this case. Accordingly, despite BIW's arguments to the contrary, it has failed to introduce probative evidence sufficient to demonstrate by a preponderance of the evidence that it was in-

jured on its performance of the CG 58, 60 and follow contracts.

*3. Adverse Inferences*

Lastly, our conclusion that BIW has failed to meet its obligatory burden, of proving the existence of an injury on either of the two contracts before this court, is buttressed by two permissible adverse inferences that the court draws, stemming from BIW's unexplained failure to introduce relevant evidence and testimony, within its possession and control, at trial. In this connection, we note preliminarily that it is well settled that "a party's failure to bring forth evidence within [its] control, or to explain such omission, warrants an inference that the evidence, if proffered, would be unfavorable to [its] cause...." *Morowitz v. United States,* 15 Cl.Ct. 621, 631 (1988) (citing *Interstate Circuit, Inc. v. United States Dept. of Treasury,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); and *Lepkowski v. United States,* 804 F.2d 1310, 1323 (D.C.Cir.1986)). First, as we noted above, BIW has failed to introduce the ECNs regarding CG 58, 60 and follow, which it alleges caused it to perform work for which it was not compensated. Nor has BIW introduced the related ECPs associated with those ECNs. Even more incredulously, BIW has failed to introduce the ECPs and ECNs analyzed pursuant to its so-called random sample study. Second, BIW also failed to present testimony from any of the estimators who analyzed the ECPs and ECNs in BIW's random sample analysis to determine whether and to what extent BIW has been harmed. Moreover, BIW has also failed to proffer a plausible explanation for said omissions. Because all of this evidence and testimony was apparently under the control of and available to BIW, we are constrained to conclude, as further discussed below, from their failure to introduce the same, and to explain such failure, that said evidence would not have lent support to BIW's substantive position before this court and would have been adverse thereto.

*a. BIW's Failure to Introduce ECPs and ECNs Relevant to CG 58, 60 and Follow*

■■■ At bar, BIW alleges that certain ECNs caused it to perform additional work

not provided for in the originally-negotiated ECPs. However, BIW has not, as noted, introduced these ECNs or their associated ECPs into the record. Nor has BIW introduced therein the ECPs and ECNs analyzed pursuant to the random sample study. When a party is in possession of documents which it alleges support its case, but fails to introduce those documents without adequate explanation, the natural and inescapable inference is that the documents would not in fact have supported that party's case. *Goldberger Foods, Inc. v. United States*, 23 Cl.Ct. 295, 307–08 (1991); *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1335–39 (D.C.Cir.1972). In order to draw an adverse inference against BIW relative to the ECPs and ECNs, then BIW must have had control or possession over them and must have failed to offer an adequate explanation for its failure to introduce them at trial.

The evidence adduced at trial demonstrates with indisputable clarity that BIW had custody and control over the relevant ECPs and ECNs. BIW admittedly received the ECPs and ECNs from Ingalls in the regular course of the design change process. Multiple copies of the ECPs and ECNs were provided to several different departments at BIW, including the Estimating Department. Furthermore, BIW's witness, Mr. Kingsbury, testified that the ECPs and ECNs relating to the CG 58, 60 and follow contracts were housed in a BIW storage facility, and that most of the ECPs and ECNs used in the random sample study were stored in a "banker's box" *at BIW's offices*. In addition, BIW has failed to provide a creditable explanation for its failure to introduce them. Instead, BIW attempts to argue, after the fact, that the estimators' worksheets are summary (*i.e.*, substantive) evidence of the ECPs and ECNs related to the random sample. *See, e.g., Bristol Steel Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 189 (4th Cir.1994) ("the [Rule 1006] summaries are introduced as the evidence."). As explained above, we reject this contention. Finally, we observe, *supra*, that BIW selected one ECN to introduce as a sample and, yet, its own witness testified that this ECN would more likely have produced a *cost reduction* for labor and materials for the CG 58, 60 and follow con-tracts than a cost growth. In view of all of the foregoing, we are compelled to draw the inference, adverse to BIW, that the ECPs and ECNs would not have supported its case.

### b. BIW's Failure to Call the Estimators and to Explain Such Failure

We are also constrained to draw a second adverse inference against BIW. In that connection, BIW alleges that its estimators, who conducted the analysis of the ECPs and ECNs, determined that BIW had been harmed by the defective ECP procedure. Yet, although the estimators were employees of BIW, it elected not to call even one of them, despite the fact that at least one of the estimators was listed on BIW's witness list. Such testimony, if adduced, could have explained precisely how the estimates were prepared as well as how the extra work was identified in the ECNs over and above that called for in the ECPs. In general, courts will draw an adverse inference from the fact of the failure of a party to call a witness when—(i) the witness is available to testify on behalf of the party, *United States v. Pizarro*, 717 F.2d 336, 346 (7th Cir.1983); (ii) the witness is unavailable in a physical or practical sense to the opposing party, *Jones v. Otis Elevator Co.*, 861 F.2d 655, 659 (11th Cir.1988); (iii) the testimony of the witness would be relevant and noncumulative, *see United States v. St. Michael's Credit Union*, 880 F.2d 579, 597 (1st Cir.1989); and (iv) the witness is not prejudiced against the party who failed to call him, *Tyler v. White*, 811 F.2d 1204, 1207 (8th Cir.1987). Because we find that all of these elements are persuasively present in the instant case, and there is no credible proof to the contrary, we again must draw the adverse inference that the testimony of these four estimators would not have supported BIW's contentions that it incurred increased costs in performing the contracts at issue in this case.

At bar, it is undisputed that the four estimators were employees of BIW and that *at least* one of them, Robert Billington, *the head of the group, remained so at the time of the trial.* Furthermore, Mr. Billington was in fact listed as a witness by BIW in its pretrial submissions. Therefore, on the undisputed

evidence, Mr. Billington, at a minimum, was admittedly available to testify on behalf of BIW.

Next, as employees of plaintiff, the estimators were practically unavailable to the defendant. In this respect, the Eleventh Circuit has noted that "availability will turn on the witness' relationship to the nonproducing party. A witness is unavailable in a practical sense when this relationship is such that it creates bias or hostility against the opposing party. Because of an employee's economic interests, the employer-employee relationship is recognized as one creating practical unavailability [to the opposing party]." *Jones*, 861 F.2d at 659–60 (citations and footnotes omitted). Because, in this instance, the estimators were employees of BIW, they could reasonably be expected to be favorably disposed to or biased in favor of BIW. Thus, under the foregoing logic, these estimators were in a practical sense *unavailable* to the government.

Third, the estimators' testimony would surely have been relevant and noncumulative as only they could explain exactly how they prepared their estimates upon which BIW in large measure rests its substantive case. Finally, these estimators should not have been prejudiced against BIW. In fact, as explained in *Jones, supra,* the employer-employee relationship makes it likely that they would have been favorably disposed towards BIW.

Therefore, all of the elements required for the court to draw an adverse inference from the failure of BIW to call any of the estimators have been met. Moreover, BIW has not offered any explanation for its failure. Accordingly, the court draws the inference that the testimony of the estimators would not have supported BIW's claims. However, we think it important to note, at this juncture, that we are not suggesting that the estimators fabricated their estimates or engaged in any sinister behavior. Nor does the court draw any such inference. Rather, it seems most likely to this court that the reason why the testimony in question would not have supported BIW's case is because, as explicated above, the random sample analysis conducted by these estimators related almost exclusively to CG 51 and simply fails to prove any of the indispensable elements of its case. Testimony from the estimators would, we believe, more likely than not have emphasized and highlighted this fact.

### 4. Conclusion

BIW has not produced any ECN which caused it to incur increased costs in performing the CG 58, 60 and follow contracts. Instead, BIW has relied exclusively on its random sample study to establish the fact that it was injured in the performance of these contracts. However, as we explained, *supra,* this study related primarily to CG 51 and was not probative of the existence of an injury in this case (CG 58, 60 and follow). BIW has introduced one ECN into evidence as a sample for the court to get an idea of what was contained in a typical ECN. This "typical ECN," which was *not* provided for in the authorizing ECP, we believe, would have *reduced,* not increased, BIW's labor and material costs in performing the contracts at issue in this case. Finally, BIW's unaccounted-for failure to introduce any of the substantive ECNs which allegedly caused it harm, or which were included in the random sample analysis, leads the court to draw the inference that these ECNs would not have established the existence of a compensable injury.

In view of this utter lack of creditable proof on BIW's part, we find that BIW has failed to meet its burden of demonstrating, by a preponderance of the evidence, that it is more likely than not that it incurred increased costs in performing the CG 58, 60 and follow contracts. Accordingly, this court is constrained to rule that BIW failed in carrying its substantive burden. Moreover, as is discussed below, BIW has similarly failed to meet its burden of proof with respect to the quantum of its damages based on the jury verdict theory of proof.

### B. Quantum: The Jury Verdict Method

■ By *its counsel's admission,* BIW has presented no direct and specific proof of its damages. Instead, BIW proceeds *solely* on a "jury verdict" theory. Stated differently, BIW contends that its random sample study provides the court with a sufficiently reason-

able basis to fairly estimate the quantum of its equitable adjustment. BIW, therefore, asks the court, within its discretion, to make an award in the nature of a jury verdict (*i.e.*, a reasonable approximation). However, while the "jury verdict method" of determining damages is employed by the courts "when damages cannot be ascertained by any computation from actual figures, . . . it is not favored and may be used only when other, more exact, methods cannot be applied." *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 880 (Fed.Cir.1991) (citing *Specialty Assembling & Packing Co. v. United States,* 355 F.2d 554, 572, 174 Ct.Cl. 153 (1966)).

■ It is, of course, well settled that "a claimant need not prove damages with exact certainty or mathematical exactitude." *Daly Constr. v. Garrett,* 5 F.3d 520, 522 (Fed.Cir. 1993); *S.W. Elec. & Mfg. Corp. v. United States,* 655 F.2d 1078, 1088, 228 Ct.Cl. 333 (1981). Rather, "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." *S.W. Elec.,* 655 F.2d at 1088. When a court does not have specific proof of actual losses, it may enter an award in the nature of a jury verdict based upon reasonable estimation. *Id.* However, the proof of damages adduced must be of "sufficient certainty so that the determination of damages will be more than mere speculation." *Malissa Co. v. United States,* 18 Cl.Ct. 672, 674 (1989).

■ In *Dawco,* 930 F.2d at 880, the Federal Circuit outlined the three required findings that must be made by the court in order for it to adopt the "jury verdict method." The court must find: "(1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." *Id.* In this case, BIW alleges that it can meet all three requirements. Notwithstanding all due deference, we strongly disagree. This is so because the court finds that BIW cannot meet *any* of these requirements; thus, we hold that BIW is not entitled to an award based on the so-called "jury verdict method." Moreover, we cannot enter any award in favor of plaintiff

on this record, since it has elected to rely exclusively on the "jury verdict method" in proving its damages. Simply put, BIW has thoroughly failed to prove any damages, as noted, *supra.* We now turn to examine each of the three required elements needed to employ the "jury verdict method."

### 1. Clear Proof of Injury

■ In order for the court to employ the "jury verdict method" in making an award, BIW must first demonstrate clear proof of injury. Obviously, this is a higher standard of proof than is required when a plaintiff is initially attempting to prove its entitlement to an equitable adjustment by establishing, by a preponderance of the evidence, the existence of injury. Otherwise, this element would be redundant as the plaintiff would have already fulfilled this requirement by showing its entitlement to the equitable adjustment (*i.e.,* liability, causation, and injury). Accordingly, BIW must prove by more than a preponderance of the evidence (clear proof) that it was in fact injured on these contracts. Given that we have held that BIW has failed to prove the existence of an injury by even a preponderance of the evidence, *a fortiori,* it necessarily follows that BIW cannot meet the higher requirement that it show *clear proof* of injury. Therefore, for the same reasons that we found that BIW's proof of the existence of an injury was inadequate, we similarly hold that BIW has unquestionably failed to demonstrate "clear proof of injury."

As noted previously, BIW relies exclusively on its random sample study to prove its injury. However, as we explained, the actual proof at bar primarily relates to the CG 51 contract rather than to the cruisers that are the subject of the contracts at issue in this case (to wit, CG 58, 60 and follow). In doing the analysis, BIW's estimators were invariably comparing the compensatory scope of work delineated in the ECNs and DVCs issued for the CG 51 contract to the work scope originally negotiated for the ECP. Furthermore, the record reflects that there were significant differences between CG 51 and the subsequent contracted cruisers, *i.e.,* the later ships were in earlier stages of production than were CG 51 ships and had dif-

ferent design specifications. Thus, while the results obtained from the random sample study may be arguably and factually probative of injury on the CG 51 contract, they are not probative of the existence of injury on the CG 58, 60 and follow contracts. Moreover, the court has drawn from BIW's failure to introduce the relevant ECPs and ECNs into evidence the adverse inference that these design documents would not have supported BIW's claim of injury in this case. For these reasons, we find that the evidence in the record unquestionably fails to establish the clear proof of injury needed for this court to employ the "jury verdict method."

### 2. No More Reliable Method Available to Compute Damages

 Secondly, the court must also be satisfied that there is no more reliable method available for computing damages before it may adopt the "jury verdict method." As the Federal Circuit explained in *Dawco*, the plaintiff bears the burden of establishing this element and must be able to demonstrate "a *justifiable inability to substantiate* the amount of his resultant injury by direct and specific proof." *Id.* at 881 (quoting *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742, 209 Ct.Cl. 643 (1976)). At bar, BIW has totally failed to establish a "justifiable inability to substantiate" its damages with direct and specific proof. Nor has BIW creditably shown that there was no more reliable method available to compute its damages.

BIW blandly and conclusively contends that it would have taken 30,000 to 40,000 man-hours, at a cost of approximately $1 million, to analyze, *retrospectively*, every pre-August 1986 ECN and ECP applicable to the cruisers at issue in this matter. Even assuming that such an analysis of damages would yield direct and specific proof of alleged damages of $5.6 million, we cannot say that this cost (*i.e.*, $1.0 million) justifies BIW's *refusal* to fully and directly substanti-

ate its damages. We observe that BIW alleges that it is entitled to roughly $3 million net in damages.[20] From an economic posture, it is certainly not unreasonable to expend $1 million to receive an award of $3 million. It is clear beyond cavil that two-thirds of something is better than 100% of nothing. Therefore, we find that the alleged cost (*i.e.*, $1.0 million) to offer more specific and detailed proof is an insufficient justification for BIW's failure to do so on this record.

More importantly, from the time that BIW first discovered the problem of late, additional, and expanded-scope ECNs, BIW could have, and should have, commenced keeping contemporaneous records of the problematic ECNs and the additional costs allegedly incurred pursuant to them. In this regard, it is significant to note that BIW was prepared to make monthly submissions of the late, additional, and expanded-scope ECNs under the draft MOA that was ultimately not adopted by the parties. This suggests that BIW was clearly capable of, or at least believed that it was capable of, identifying and specifically estimating the cost of these ECNs on an ongoing basis. In view of the evidence in the record, we hold that BIW has, therefore, failed to demonstrate a justifiable inability to substantiate the amount of its injury with direct and specific proof.

Moreover, and notwithstanding BIW's ability or inability to present direct and specific proof, the record is eminently clear that BIW could have offered *more reliable proof* of the amount of its alleged injury than was offered at trial, even if it could not have offered direct and specific proof. First, BIW could have estimated the increased costs of performance individually for each cruiser, rather than trying to generalize from one ship to another. This would have meant analyzing the ECNs applicable to the ships at issue under the CG 58, 60 and follow contracts, rather than the ECNs applicable to CG 51, and determining the increased cost incurred *on each ship*. Given BIW's obvious ability to

**20.** BIW's complaints seek roughly $5.6 million. However, BIW presented evidence at trial that BIW's actual award, if any, must be reduced by the "share line" provision of the contracts. This provision requires BIW to absorb 50% of the costs on the cruisers after the target cost has

been surpassed. At trial, Mr. Jacunski testified that if the court found that BIW had incurred $5 million in additional costs, BIW would be entitled to an award of $3.25 million, assuming a profit rate of 15% ($3.25M = $5M × 50% + $5M × 15%). (Tr. 1180–83).

analyze the CG 51 ECNs, it follows that BIW could easily have done a comparable random sample analysis, which examined the relevant ECNs (*i.e.*, those applicable to CG 58, 60 and follow), and compared them to the original related ECPs.

BIW contends that it did not use the ECNs applicable to CG 58, 60 and follow because they were still in use during the production of CG 58. However, the evidence shows that BIW received multiple copies of the ECNs, and, moreover, Mr. Kingsbury testified that when he collected the ECNs for the random sample analysis he found the ECNs, made copies of them, and then replaced them in the files where he had found them. This evidence indicates to the court that BIW could have analyzed the CG 58, 60 and follow ECNs with a minimal amount of disruption to production. In addition, CG 58 was essentially completed by the end of 1988, and all of the ships at issue in this case were completed by April 1991, while suit was filed in 1990. This case was not tried until March 1995. Given these time frames, there is absolutely no reason why BIW could not have developed substantially more reliable proof of its damages (*i.e.*, proof related to CG 58, 60 and follow) for trial.

Additionally, it is likewise readily apparent that BIW could have analyzed a random sample drawn from a universe of ECPs that did not include ECPs that were exclusively applicable to CG 51. Indeed, the Navy provided BIW with a list (universe) of ECPs, which applied only to CG 58, 60 and follow, for BIW to analyze. BIW refused to analyze this list, contending that it did not reflect the proper universe of ECPs because it left out those ECPs applicable only to CG 58, 60 and follow that were issued prior to June 30, 1985.[21] (Tr. 723–24, 927). However, BIW never took any steps to analyze what it contended was the proper universe, *i.e.*, all of the ECPs applicable to CG 58, 60 and follow. Therefore, in light of all of the foregoing, we find that BIW could have, and should have, presented more reliable proof of damages. Specifically, BIW could have conducted a random sample analysis of the ECPs and ECNs applicable to the vessels *at issue in this case*. Accordingly, we hold that BIW has failed to meet its burden of establishing that there was no more reliable method available for computing its damages.

### 3. Sufficient Evidence for a Fair and Reasonable Approximation

Lastly, in order to employ the "jury verdict method," the evidence adduced at trial must also be sufficient to allow the court to make a fair and reasonable approximation of the plaintiff's damages. As has been previously explicated in detail, the evidence introduced by BIW related to a contract (CG 51) that is *not* before this court. In addition, the evidence strongly suggests that it would not be appropriate to generalize from CG 51 to the subsequent cruisers because they were at earlier stages of production and because they had different design specifications. Moreover, BIW has failed to present any probative evidence concerning the accuracy and validity of its estimating methodology. BIW failed to consult a statistician or other expert in conducting its random sample study. Moreover, no expert testimony was elicited at trial on the validity and/or accuracy of BIW's study. Furthermore, Mr. Kingsbury, the individual charged with supervising and conducting the analysis, had not previously studied statistics and, more importantly, had a marginal academic background in mathematics and accounting.[22] For all of these reasons, we hold that BIW has failed to adduce sufficient credible evidence to allow the court, on this record, to

---

21. The Navy had excluded certain ECPs from its proposed universe, contending that BIW had released, by contract modification, any claim to an equitable adjustment for ECPs adjudicated prior to June 30, 1985. (Tr. 723–24).

22. Mr. Kingsbury stated that he attended Colby College for four years, majoring in political science, but was unable to obtain a degree because he failed to satisfy a foreign language requirement. While in college, Mr. Kingsbury took no mathematics, statistics, or accounting courses. In 1986, Mr. Kingsbury took a one-semester course in estimating, and, in 1987 or 1988, he took between six and seven three- to five-day government contracting seminars, one or more of which was in auditing. This was the extent of Mr. Kingsbury's mathematics and accounting background. (Tr. 934–37).

make a fair and reasonable approximation of the quantum of its alleged injury.

■ BIW argues that the Navy uses random sampling from time to time to estimate costs when settling claims. However, the mere fact that the Navy accepts a certain method of proof when it is amicably settling disputed contract issues does not in any way compel the conclusion that the same method of proof is legally sufficient to entitle BIW to a "jury verdict" award. Moreover, given the general proposition that the Navy uses random sampling that does not indicate anything about the accuracy and/or validity of *this particular random sample analysis*. In fact, as has been explained, the evidence in the record amply demonstrates that BIW's approach to proving its claim and the methodology used pursuant to that approach are *seriously flawed*.

Finally, BIW points to precedent in the Court of Federal Claims, and elsewhere, and argues that reasonable estimating methodologies, especially random sampling, have been employed by the courts to award approximate damages. *See, e.g., Skip Kirchdorfer, Inc. v. United States*, 14 Cl.Ct. 594 (1988). However, notwithstanding the holdings in other cases, *the evidence in this case* must support the reasonableness of BIW's estimating methodology. For example, in *Skip Kirchdorfer*, 14 Cl.Ct. at 610, the U.S. Claims Court stated—"[b]ased on the testimony adduced at trial and analysis of the documentary evidence, it is found that plaintiff has offered reasonably satisfactory evidence of its damages computed on an acceptable basis...." Significantly, in that case, the court was persuaded by *expert testimony* concerning the relative accuracy and validity of the plaintiff's estimating methodology. *Id.* at 609.[23] By contrast, in the instant matter, plaintiff failed to offer any expert opinion testimony. Moreover, we cannot reach the same conclusion based on the dearth of evidence at bar.

Therefore, in light of the foregoing, we are constrained to conclude that the evidence in the record is insufficient to allow the court to make a fair and reasonable approximation of the quantum of BIW's alleged damages. Any damages awarded by this court in this case would be nothing more than "mere speculation," and thus a gratuity. Case law teaches us that, in such a situation, the court may not make such an award. *See, e.g., Malissa Co.*, 18 Cl.Ct. at 674 (quoting *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831, 155 Ct.Cl. 360 (1961)). Accordingly, the court finds that BIW is not entitled to an award based on this method. Because BIW relies entirely on the "jury verdict method," this court has no alternative but to hold that BIW is not entitled to any damage award.

## CONCLUSION

For the foregoing reasons, we hold that plaintiff has failed to meet its initial burden of proving both its entitlement to an equitable adjustment as well as the quantum of its alleged damages. Plaintiff's proof related almost entirely to a shipbuilding contract not before the court. Moreover, plaintiff offered no explanation for its failure to introduce relevant evidence, which requires an adverse inference. Lastly, plaintiff falls short of meeting the necessary requirements for a "jury verdict." As a consequence of plaintiff's failure of proof, defendant is, therefore, entitled to judgment as a matter of law. Accordingly, the Clerk shall enter judgment for the defendant and dismiss plaintiff's complaints. Costs to the defendant.

IT IS SO ORDERED.

---

**23.** The court's analysis of the case law reveals that when federal courts accept evidence in the form of statistical inferences based on random sampling, they invariably rely on expert testimony to establish the accuracy and validity of such inferences. *See Fury Imports, Inc. v. Shakespeare Co.*, 554 F.2d 1376, 1385–88 (5th Cir.1977); *Green v. United States Steel Corp.*, 640 F.Supp. 1521, 1540, 1544 (E.D.Pa.1986).